RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0049p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

          *Plaintiff-Appellee*,

*v.*

ERICK JAMAL HENDRICKS,

          *Defendant-Appellant*.

No. 19-3232

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:16-cr-00265-1—John R. Adams, District Judge.

Decided and Filed: February 19, 2020

Before: SILER, GIBBONS, and READLER, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ON BRIEF:** Christian J. Grostic, FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant. Matthew W. Shepherd, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

JULIA SMITH GIBBONS, Circuit Judge. A jury convicted Erick Jamal Hendricks of attempting and conspiring to provide material support to a foreign terrorist organization. He raises three issues on appeal. First, Hendricks argues that the trial evidence was insufficient to prove beyond a reasonable doubt that he attempted or conspired to provide material support to a foreign terrorist organization. Second, Hendricks argues that, for substantially the same reason, the district

court abused its discretion by denying his motion for a new trial.  Finally, Hendricks argues that the district court abused its discretion by partially closing the courtroom during testimony from an undercover FBI agent.  We find that the government presented sufficient evidence for a rational juror to find each element of the charged offenses beyond a reasonable doubt.  We also find that the district court properly denied Hendricks a new trial and adequately justified its partial closure of the courtroom.  We therefore affirm Hendricks's convictions.

I.

A grand jury indicted Erik Jamal Hendricks on one count of conspiracy to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1), and one count of attempting to provide material support to a designated foreign terrorist organization, also in violation of § 2339B(a)(1).  Both counts charged Hendricks with conspiring or attempting to provide material support in the form of personnel and services to the Islamic State in Iraq and Syria ("ISIS" or the "Islamic State").

At trial, four witnesses—Amir Al-Ghazi, Janet Miller, Hamza al-Ansari, and Amanda Amaro—testified that Hendricks approached them about forming a group for the purpose of waging jihad in the United States.  According to Miller, Amaro, and al-Ansari, Hendricks expressed admiration for ISIS and inquired about their views on the organization or its ideology.  Hendricks shared that he had purchased land and weapons for his group, occasionally asking whether they owned guns or suggesting that they should be trained to fight or operate weapons.  Hendricks also exhorted each to recruit other like-minded individuals and, in some instances, connected them with other recruits.

Al-Ghazi and Amaro testified that they believed Hendricks was trying to form an ISIS cell.  Al-Ghazi explained that, when Hendricks approached him, he deduced that Hendricks was "a recruiter for the Islamic State."  DE 95, Trial Tr., Page ID 2204.  "I was saying things on Twitter in support of [the] Islamic State," Al-Ghazi testified, "[s]o if you were looking for me" it was because "I was pledging allegiance to ISIS at the time."  *Id.* at 2191, 2204.  Al-Ghazi referred at least one recruit to Hendricks.  Amaro also shared that she perceived Hendricks to be "build[ing] . . . an extension of [ISIS] in America."  DE 96, Trial Tr., Page ID 2401.  And Miller testified that

Hendricks "supported the Islamic State" and "the establishment of [an] Islamic State." DE 95, Trial Tr., Page ID 2252, 2265. She recalled that Hendricks asked her to put him in direct contact with other ISIS supporters, including a "hate preacher" in the United Kingdom who could act as a "guide into the Islamic State." *Id.* at 2254.

Amaro further testified that Hendricks ordered her to disseminate a three-paragraph document claiming responsibility for a terror attack in Garland, Texas. Although Hendricks authored its contents, Amaro testified that she transcribed the document, devised a title, and posted it online, all at the direction of Hendricks. In the document, Hendricks wrote that the Garland attack had been carried out by his group, which he referred to as the "Islamic State in America." DE 160-2, Ex. 53, Page ID 3485. He claimed to "have 71 trained soldiers in 15 different states" and pledged allegiance "[t]o our Amir Al Mu'mineen"—a reference to the leader of ISIS. *Id.* at 3486. Hendricks also incorporated an image of the ISIS flag just above the text. After the document was published, he ordered Amaro to directly share it with several prominent ISIS supporters, including two senior members of ISIS in Syria, which she did. Amaro recalled that one of the senior members "seemed pleased with the message." DE 96, Trial Tr., Page ID 2420.

Hendricks had similar interactions with an undercover FBI agent, Special Agent Steven Jane. As with the other witnesses, Hendricks conveyed to Jane that he was forming a group to wage jihad domestically. He connected Jane to other recruits and discussed training together on his land. Jane eventually asked Hendricks to define the link between his group and the ISIS organization. Hendricks used the analogy of a body's brain and its limbs. His venture, Hendricks explained, was a limb and ISIS the "[u]ltimate brain." DE 92, Trial Tr., Page ID 1522. "Ultimately the brain is the [caliphate]," he emphasized. *Id.* at 1518. When pressed by Jane to further clarify whether his cell was "part of the bigger team" (i.e., ISIS) or "a new team," Hendricks elaborated by comparing ISIS to the headquarters of a business and his cell to an "outpost[]." *Id.* at 1521–22.

Jane also asked Hendricks how he could help "the brain." *Id.* at 1528. Jane indicated a willingness to travel to join ISIS in Iraq or Syria but told Hendricks that he wanted to be sure he had "the blessing of the brain." *Id.* In response, while praising Jane's proposed travel as a "great deed," Hendricks said that he had "spoken to senior brothers and the [advice] is to remain here." *Id.* at 1529. In a later conversation, Hendricks again told Jane that traveling to join ISIS in Iraq or

Syria "is not what senior people requested [of] me." *Id.* at 1552.  Lorenzo Vidino, Ph.D., an expert on terrorism, testified that these interactions were consistent with ISIS strategy at the time.  ISIS leaders, he explained, directed supporters to "[c]arry out attacks wherever you are, . . . under the ISIS umbrella."  DE 93, Trial Tr., Page ID 1696.

At the close of the government's case, Hendricks moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal as to both counts.  The district court denied his motion. Hendricks did not present any witnesses or evidence.  Shortly thereafter, the jury returned a guilty verdict on both counts of the indictment.  After trial, Hendricks renewed his motion for a judgment of acquittal and moved for a new trial under Federal Rule of Criminal Procedure 33.  The district court denied both motions.  Hendricks timely appealed.

## II.

Hendricks raises three arguments on appeal.  First, Hendricks argues that the district court erred in denying his motion for a judgment of acquittal because there was insufficient evidence to sustain his convictions.  Specifically, he asserts that, although the government may have proved that he took independent actions inspired by ISIS or supporting its goals, there was no evidence that his actions were directed by, controlled by, or done in concert with ISIS.  Second, relying on substantially the same reasoning, Hendricks argues that the district court abused its discretion in denying his motion for a new trial because the evidence weighed heavily against the verdict. Finally, Hendricks argues that the district court abused its discretion by partially closing the courtroom to protect the identity of a testifying FBI agent.  We address each issue in turn.

## A.

Hendricks first argues that the trial evidence was insufficient to establish that he conspired or attempted to provide material support to ISIS.  A defendant challenging the sufficiency of the evidence supporting her conviction "bears a very heavy burden." *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)). When reviewing an insufficient evidence claim on appeal, we must affirm a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v.*

*Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[W]e do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury," *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994), and "[c]ircumstantial evidence alone is sufficient to sustain a conviction," even if it does not "remove every reasonable hypothesis except that of guilt," *Spearman*, 186 F.3d at 746 (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986)).

Section 2339B(a)(1) makes it a federal crime to "knowingly provide[] material support or resources to a foreign terrorist organization," as well as to "attempt[] or conspire[]" to do the same. 18 U.S.C. § 2339B(a)(1). The term "material support or resources" is defined to include, *inter alia*, the provision of any "service" or "personnel."[1] *Id.* § 2339A(b)(1). A person provides "personnel" to a foreign terrorist organization if she makes available one or more persons—who may be or include herself—to work under that organization's "direction or control." *Id.* § 2339B(h). As the statute makes clear, a person does not work under the "direction or control" of a terrorist organization if she "act[s] entirely independently of the . . . organization to advance its goals or objectives." *Id.*; *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 23 (2010) (emphasizing that the term "personnel" excludes "*independent* advocacy"). Similarly, although there is no applicable statutory definition, the Supreme Court has explained that the term "service" also refers to "concerted activity," including any "act done for the benefit or at the command of" a foreign terrorist organization. *Holder*, 561 U.S. at 23–24 (quoting Webster's Third New International Dictionary 2075 (1993)).

In the present case, there was ample evidence from which a rational juror could find that Hendricks attempted and conspired to provide material support to ISIS. As an initial matter, Hendricks does not contend that he lacked the requisite intent or common purpose to form and operate a terrorist cell. Nor does he contend that he failed to take a substantial step toward engaging in such activity. Instead, he contends only that the government failed to present evidence

---

[1]As defined in full, "the term 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(1).

that he agreed or intended to do so on behalf of ISIS. That argument, however, ignores evidence from which a jury could reasonably infer that Hendricks (1) communicated with and took direction from ISIS members, (2) viewed himself and his recruits as agents of ISIS, and (3) acted in a manner consistent with someone who was operating or seeking to operate on behalf of ISIS. Those reasonable inferences, whether considered individually or in combination, support the jury's finding that Hendricks and his group operated under the direction or for the benefit of ISIS.

First, the government presented evidence that Hendricks was communicating with and acting at the direction of senior ISIS members. When discussing ISIS and whether to join the group in Iraq or Syria, Hendricks told Special Agent Jane that he had "spoken to senior brothers." DE 92, Trial Tr., Page ID 1529. Those individuals, Hendricks claimed, had advised him to "remain here" in the United States, rather than travel overseas. *Id.* Hendricks repeated the same claim in a second conversation with Jane, stating that traveling to join ISIS in Iraq or Syria was "not what senior people requested [of] me." *Id.* at 1552. The government's expert, Dr. Vidino, testified that the substance of these conversations was consistent with the thinking of ISIS leaders at the time. Although Hendricks contends that he referred to all ISIS supporters as "brothers," this particular reference to "senior brothers" and "senior people" arose while discussing whether to join ISIS overseas. A jury could thus reasonably infer that Hendricks was communicating with and acting at the direction of ISIS members.

Second, the government presented evidence that Hendricks viewed himself and his recruits as agents of the ISIS organization. In discussions with Jane, Hendricks used the analogy of a body's brain and its limbs to describe the relationship between his venture and the ISIS organization. His venture, Hendricks explained, was a limb and ISIS the "[u]ltimate brain." *Id.* at 1522. When pressed by Jane to clarify whether his cell was "part of the bigger team" (i.e., ISIS) or "a new team," Hendricks elaborated by comparing ISIS to the headquarters of a business and his cell to an "outpost[]." *Id.* at 1521–22. That description was consistent with how Hendricks conducted his recruitment activities. Amir Al-Ghazi, a cooperating witness who connected Hendricks with a prospective recruit, testified that Hendricks identified himself as a "recruiter." *Id.* at 2201. Although Hendricks never mentioned ISIS by name, Al-Ghazi understood Hendricks to be a "recruiter for [ISIS]," explaining that Hendricks knew Al-Ghazi had "pledg[ed] allegiance"

to ISIS.  *Id.* at 2204.  "You wouldn't be looking for me," Al-Ghazi testified, unless you were specifically interested in his ISIS affiliation.  *Id.*  A jury could thus reasonably infer that Hendricks viewed himself as operating on behalf of ISIS.

Finally, the government presented evidence that Hendricks acted in a manner consistent with someone who was operating or seeking to operate on behalf of ISIS.  After a terror attack in Garland, Texas, Hendricks ordered Amanda Amaro to disseminate a document he had authored claiming responsibility on behalf of the "Islamic State in America."  DE 160-2, Ex. 53, Page ID 3485.  In the document, Hendricks expressed allegiance to the leader of ISIS—referring to him as "our" leader—and appended an image of the ISIS flag.  *Id.* at 3485–86.  He then directed Amaro to share the document with several ISIS members, which she did.  Although Hendricks argues that calling his group the "Islamic State in America" was meant to evidence its independence, it was reasonable for the jury to infer that his use of the Islamic State name—especially when read in conjunction with his invocation of the ISIS leader and flag—conveyed an affiliation with ISIS.  Similarly, although Hendricks directed Amaro to share the document with ISIS members only after it had been published, a jury could reasonably interpret these contacts as attempts to coordinate or continue coordinating with ISIS.

Hendricks points out that the record contains no direct evidence that he contacted ISIS members or was directed to act on behalf of ISIS.  The jury, he continues, could therefore only speculate and pile "inference upon inference" to find that he attempted and conspired to direct personnel or services to ISIS.  CA6 R. 14, Appellant Br., at 32 (quoting *United States v. Coppin*, 1 F. App'x 283, 289 (6th Cir. 2001)).  Hendricks is right that the government presented no direct evidence of any conversation or meeting with specific ISIS members where Hendricks was directed or proposed to establish an ISIS cell.  It was not necessary, however, for the government to present such evidence.  A conviction may be based on "[c]ircumstantial evidence alone." *Spearman*, 186 F.3d at 746 (quoting *Vannerson*, 786 F.2d at 225).  And in this case, there was a mountain of circumstantial evidence from which a juror could find beyond a reasonable doubt that Hendricks attempted and conspired to direct services or personnel to the ISIS organization—not merely operate an "entirely independent[]" venture.  18 U.S.C. § 2339B(h).  Accordingly, we find that the evidence was sufficient to support both of Hendricks's convictions.

B.

Hendricks next argues that the district court abused its discretion in denying his motion for a new trial.  Under Federal Rule of Criminal Procedure 33, a district court "may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  In general, a jury verdict should be vacated only "in the extraordinary circumstance[] where the evidence preponderates heavily against the verdict." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (quoting *United States v. Turner*, 490 F. Supp. 583, 593 (E.D. Mich. 1979)).  When considering a Rule 33 motion, the trial judge acts as a "thirteenth juror, weighing evidence and making credibility determinations." *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018).  Our review, however, is limited to determining whether "the district court's ruling was a clear and manifest abuse of discretion." *United States v. Hernandez*, 227 F.3d 686, 695 (6th Cir. 2000).

Hendricks points to the same alleged deficiencies in the trial record to support his argument that the district court abused its discretion.  He contends that the absence of direct evidence linking his operations to the ISIS organization outweighs any circumstantial evidence tending to show the same.  As outlined above, however, there was ample evidence—whether considered in isolation or in combination—from which a juror could find that Hendricks attempted and conspired to direct services or personnel to ISIS.  The district court, in denying his Rule 33 motion, agreed, finding credible the evidence that Hendricks (1) had communicated with and taken direction from ISIS members, and (2) viewed himself as an extension of the ISIS organization.  It further found that Al-Ghazi's perception of Hendricks as an ISIS recruiter, along with his referral of another recruit to Hendricks, was more than adequate to prove at least one conspiracy.  The trial record, as discussed above, supports the district court's conclusions.  Accordingly, we affirm the district court's denial of Hendricks's motion for a new trial.

C.

Hendricks also argues that the district court abused its discretion by partially closing the courtroom during Special Agent Jane's testimony.  Jane is an undercover FBI agent who conducts counterterrorism investigations.  Prior to trial, the district court entered a protective order governing Jane's testimony.  The protective order provided, *inter alia*, that Jane could testify using

an "undercover pseudonym," wear a "light disguise," enter the courthouse using a nonpublic entrance, and seat himself on the witness stand "outside the presence of the jury and defendant." DE 84, Order, Page ID 586–87. The order also directed that the public be moved to a different room with real-time audio and display of exhibits but no video or images of the witness. Hendricks challenges only the closure provision on appeal.

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial." U.S. Const. amend. VI. The right to a public trial, however, "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller v. Georgia*, 467 U.S. 39, 45 (1984). These instances are "rare" and "the balance of interests must be struck with special care." *Id.* In turn, to justify partially closing a trial, (1) the moving party must show a "substantial reason" that is "likely to be prejudiced" absent the closure, (2) the closure must be "narrowly tailored," (3) "the trial court must consider reasonable alternatives," and (4) "the trial court must make findings adequate to support the closure." *United States v. Simmons*, 797 F.3d 409, 414 (6th Cir. 2015). Although we review a district court's closure decision for abuse of discretion, any error gives rise to a presumption of prejudice and "require[s] automatic reversal." *Id.* at 413 (quoting *United States v. Stewart*, 306 F.3d 295, 321 (6th Cir. 2002)).

Here, the district court clearly articulated the necessity and rationale supporting its limited closure of the courtroom. The court explained that Jane's safety, as well as the integrity of his active investigations, would be jeopardized if the general public could observe his physical appearance. This was especially so, the district court explained, because the government had "shown that both [Hendricks] and others utilizing the same social media platforms and . . . sharing the same [jihadist] ideologies" had "engaged in extensive counter-surveillance measures to detect undercover law enforcement." DE 84, Order, Page ID 585. Indeed, as the government submitted to the court, Hendricks had shared documents detailing how to identify undercover agents and reminded one cooperating witness that "the punishment for telling on a Muslim is death." DE 63, Mot. for Protective Order, Page ID 348. As even Hendricks concedes, the threat to Jane's safety and effectiveness was a substantial reason for partially closing the courtroom. *See Simmons*, 797 F.3d at 414 (noting that "witness safety" has "consistently" been accepted as a substantial reason

for partial closures); *see also Brown v. Artuz*, 283 F.3d 492, 501 (2d Cir. 2002) ("The safety of a police officer working undercover surely constitutes an overriding interest.").

The district court also considered two alternatives: use of a screen to block the witness and use of a heavier disguise. Both alternatives were designed to obscure Jane's true physical appearance—the government's main interest—but still allow the public to observe his testimony. After a colloquy about the courtroom's layout and the parties' ability to view the witness, however, the court rejected use of a screen, finding that the measures eventually included in the protective order would be "less intrusive." DE 126, Hr'g Tr., Page ID 3037. Hendricks "agree[d]." *Id.* at 3038. Similarly, with respect to use of a heavier disguise, Hendricks voiced concerns that any physical alterations could interfere with the jury's ability to "see the reaction of the witness" or "read his responses facially." DE 126, Hr'g Tr., Page ID 3037. The use of a heavy disguise, Hendricks warned, could also infringe upon his right to confront the witness. The court weighed each of these considerations and concluded that use of a light disguise, as well as live-streamed audio in a separate room, would best balance the defendant's public trial right against both his confrontation right and the government's interest in protecting the witness.

Hendricks takes issue with the thoroughness of the trial court's findings, arguing that it should have considered whether the light disguise alone was adequate to protect Jane. While the district court could have more clearly articulated its findings on this point, we can still "glean" the court's reasoning and supporting facts "from the record." *Simmons*, 797 F.3d at 415 (quoting *United States v. Farmer*, 32 F.3d 369, 371 (8th Cir. 1994)); *see also Waller*, 467 U.S. at 45 (explaining that purpose of findings requirement is to allow review of the reason for closure). The disguise was limited to minor physical details—so minor, in fact, that none of the participants could discern what features, if any, had been altered. The court even stated that observers could "see [the witness's] face like any other witness." DE 92, Trial Tr., Page ID 1418. The disguise, in short, was insufficient to protect an undercover agent from attempts at countersurveillance. After the judge and parties had inspected the witness, Hendricks renewed his objection, and the court—specifically noting the objection—adhered to its prior ruling. True, the court never expressly found that the disguise would allow for identification; however, based on its existing rationale, prior consideration of alternatives, and reasoned balancing of the parties' interests, the

court's adherence to its earlier ruling clearly conveyed that the light disguise was insufficient to protect the witness. We therefore find that the district court did not abuse its discretion.

III.

Based on the foregoing, we affirm Hendricks's convictions for attempting and conspiring to provide material support to a foreign terrorist organization.