RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0062p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JASON ROSALES,

*Defendant-Appellant*.

No. 19-3749

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:17-cr-00024-1—Walter H. Rice, District Judge.

Argued: January 14, 2021

Decided and Filed: March 12, 2021

Before: SUHRHEINRICH, CLAY, and DONALD, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Kathleen Basalla, Trane Robinson, UNIVERSITY OF CINCINNATI COLLEGE OF LAW, Cincinnati, Ohio, for Appellant. Kevin Koller, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Colter L. Paulson, SQUIRE PATTON BOGGS (US) LLP, Cincinnati, Ohio, Nathan L. Colvin, UNIVERSITY OF CINCINNATI COLLEGE OF LAW, Cincinnati, Ohio, for Appellant. Kevin Koller, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee.

—————————————

**OPINION**

—————————————

SUHRHEINRICH, Circuit Judge.

## I.  INTRODUCTION

Following a jury trial, Jason Rosales appeals his convictions for conspiracy to possess with intent to distribute and attempt to possess with intent to distribute 500 grams or more of methamphetamine under 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(viii), and his sentence of 240 months' imprisonment.

For the following reasons, we affirm the convictions and remand to the district court for resentencing.

## II.  BACKGROUND

In February 2017, Monica Duran agreed to transport drugs for her boyfriend "Christian" from Santa Ana, California to Springfield, Ohio on a Greyhound bus.  Duran hid ten packages of methamphetamine, weighing a total of 4,427 grams, in a black duffel bag.

Christian arranged for money to be transferred to Duran to cover the expenses of the transport.  On February 10, Christian texted Duran a reference number for a money wire to Walmart along with "send[er] Terry Tolle."  Subsequent investigation identified Tolle as the father of Rosales' then-girlfriend Tinisha Delong.

On February 13, the Drug Enforcement Agency ("DEA") intercepted Duran while she was en route to Ohio.  Duran agreed to cooperate in exchange for leniency and allowed the government to copy all calls, texts, and data from her cellphone.

That same day, under the direction of law enforcement, Duran texted Christian to inquire whether the drug delivery would occur that night and whether he would send her the number of the local contact.  Christian sent Duran the address of a local Comfort Inn, indicating that a prior drug delivery had taken place there.  At 1:12 a.m. on February 14, Christian texted Duran the number for the local contact, which ended in 0163, along with the words, "on the part of the

cousin." Duran testified that she understood from the text that this was the person to whom she was supposed to deliver the drugs, and that she should tell the contact she was calling on behalf of the cousin.

At around 10:42 a.m. on February 14, Duran told Christian she would call the contact. Christian texted Duran, "they are ready for you to speak to them. Okay. First someone will come by for you to give them that, [and] then another person will come by for them to give you papers, okay." Duran then called the number Christian had texted her the night before, and Rosales answered. She told him that she was calling "on behalf of cousin," to which Rosales replied, "Yes, he wasn't calling me. Well, I'm going to call him." A short time later in a subsequent conversation Rosales expressed confusion about where he was supposed to go to meet her. When Duran texted Christian about this confusion Christian responded, "He doesn't know where the hotel is. Well, they met up there last time unless it's someone else who is coming to pick up. Give him the address then."

Several hours later when Duran called Rosales, he told her that he "shouldn't be that long" and again clarified which hotel he was supposed to meet her at. He then texted, "[s]o its outside." Duran testified that she understood this to be a reference to the drugs and responded affirmatively. A few minutes later Rosales texted that he was outside in a burgundy minivan, but law enforcement officers saw no such vehicle. Duran then called Christian and told him that the contact was not outside. Christian said he would call the local contact. Christian called her back a few moments later and said he had spoken with the contact and that this was a tactic to make sure she had not been followed.

Shortly thereafter Christian texted her that the new plan was for her to take a taxi to a house in Springfield, Ohio. Law enforcement identified the house as the residence of Rosales and his father Stephen Rosales. Following instructions from law enforcement, Duran insisted that the delivery take place at the hotel.

Around 4:30 p.m. Christian called Duran. Though the DEA inadvertently did not record that call, DEA task force officer Sean Zint, while listening to the call between Christian and Duran wrote down, "elevated Ram P.U. $5,000." A short time after that call Rosales texted

Duran that he was "outside in a big truck." Christian then called Duran and said, "they are around there now." After realizing that he was at the wrong hotel, Duran texted Rosales the address of the Comfort Inn in Dayton, Ohio and confirmed with Christian that Rosales was on his way to the correct location.

At 5:19 p.m. Rosales texted Duran that he was on his way to meet her and also said, "You're going with me. My brother said you don't want to be there. You can stay—no problem. No one is going to mess with you. You can stay as long as you like. Pops will be there." Duran testified that she was confused about this message because she had not agreed to stay at anyone's house.

At 6:13 p.m. Rosales texted Duran that he had arrived. Duran told him, "Go to the Nissan truck that has the Wisconsin plates. I put the bag there underneath." Rosales then texted, "are you ready?" Rosales parked his truck next to the minivan and, without waiting for Duran, picked up the large duffel bag containing the drugs and placed it in his car.

At that point, a group of armed officers surrounded Rosales. Rosales then threw his phone to ground, causing it to break apart, and said, "fuck it." As he was being searched incident to arrest Rosales told the arresting officer, "I bet you had fun today." That evening, officers searched for the cellphone, but recovered only the battery and cover of Rosales' phone. An officer returned the next day to continue the search but was unable to locate any other parts of the phone.

Officers found a bundle of cash totaling $6,962 in Rosales' front pocket, $5,000 of which was in large bills. Officers also searched the pickup truck and found two money orders from a Walmart in Springfield, Ohio. Both money orders were sent around 4:00 p.m. on February 10, approximately one hour before Christian had texted Duran the details of the money order that had been sent in her name to fund the transport. The officers also searched Rosales' home, where they found $9,500 in cash and a knife. No controlled substances, drug paraphernalia, or drug ledgers were found.

The DEA issued an administrative subpoena for the subscriber information and toll records of the 0163 phone number. The service provider was not able to provide subscriber

information, but the toll data for the phone number listed the contacts with Duran's phone along with nine contacts on February 13 and seven text messages exchanged on February 14 between the 0163 number and a Mexican phone number used by Christian. The toll records indicated that the last outgoing communication was at 6:31 p.m. on February 14, which was about the time that Rosales was arrested and spiked his cellphone. Several incoming calls came after that time, but none were connected, suggesting the phone was no longer in use.

At trial, over the objection of both parties, the court instructed the jury to find the quantity of drugs involved in the conspiracy as a whole, rather than just the amount that was foreseeable to Rosales.

The jury convicted Rosales on both the conspiracy and attempt to possess counts. The jury found that the conspiracy involved 4,427 grams of methamphetamine. It also found the same quantity for the attempt to possess count.

At sentencing, over Rosales' objection, the district court gave a two-point enhancement for obstruction of justice because Rosales had thrown his cellphone to the ground during his arrest. The court departed down from the Guidelines range and imposed a sentence of 240 months' imprisonment for each count, to be served concurrently.

On appeal Rosales argues that (1) there was insufficient evidence to convict on conspiracy to possess with intent to distribute and attempt to possess with intent to distribute; (2) the district court erred by not instructing the jury to find only the quantity of drugs in the conspiracy that was reasonably foreseeable to the defendant; and (3) the district court erred in applying a two-level sentencing enhancement for obstruction of justice.

## III. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

We review de novo a challenge to the sufficiency of the evidence. *United States v. Farrad*, 895 F.3d 859, 871 (6th Cir. 2018). We consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Tocco*, 200 F.3d

401, 424 (6th Cir. 2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "We do not weigh the evidence, assess the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Smith*, 749 F.3d 465, 477 (6th Cir. 2014) (cleaned up). Circumstantial evidence alone can be sufficient to sustain a conviction, even if it does not remove every possibility besides that of guilt. *United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020) (cleaned up).

To sustain a conviction for conspiracy under 21 U.S.C. § 846, the government must have demonstrated: (1) an agreement to violate drug laws; (2) knowledge and intent to join the conspiracy; and (3) participation in that conspiracy. *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009).

Rosales argues that the government failed to prove beyond a reasonable doubt that he had the requisite intent for either conviction. He argues that his conduct was at least as consistent with the defense's theory that he was merely picking up a guest and had no knowledge that she was a drug courier. Rosales also suggests that there was no evidence that he was a drug dealer beyond the cash found on his person and in his home. He further argues that, without more direct evidence demonstrating his knowledge that the bag contained drugs and that he was a part of the conspiracy, no reasonable jury could have found him guilty.

But a conviction can be sustained "even if [the evidence] 'does not remove every reasonable hypothesis except that of guilt[.]'" *Hendricks*, 950 F.3d at 352 (quoting *United States v. Spearman*, 183 F.3d 743, 746 (6th Cir. 1999)). Here, Rosales suggested that he was merely picking up a friend of a friend from out of town. He supported this theory by pointing out, amongst other things, that the government had not found any overt references to drugs in any of his conversations with Duran. He also suggested that his alleged initial confusion about to where to pick her up was incompatible with Christian's statement that "they met up there last time." While these are plausible arguments to make at trial, they were clearly rejected by the jury when it found Rosales guilty on both counts.

Rosales argues that the single transaction that took place is insufficient to demonstrate that there was a conspiracy to violate drug laws. It is true that "[t]he buy-sell transaction is

simply not probative of an agreement to join together to accomplish a criminal objective beyond that already being accomplished by the transaction." *United States v. Hamm*, 952 F.3d 728, 736 (6th Cir. 2020) (quoting *United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir. 1991)). To establish that a single transaction is part of a larger conspiracy we have considered several factors, including: "(1) the length of the relationship; (2) the established method of payment; (3) the extent to which transactions are standardized; and (4) the level of mutual trust between the buyer and the seller." *Deitz*, 577 F.3d at 681 (citation omitted).

Here, a reasonable jury could have found that there was a previous relationship between Rosales and Christian. Christian indicated to Duran that someone whose phone number ended in 0163 would be coming to retrieve the drugs. When Duran called that phone number Rosales answered. Rosales never identified himself, nor asked Duran to identify herself. The only identifying information was Duran's initial statement that she was calling on behalf of the cousin. Rosales seems to have understood this to mean Christian, as he did not question who the cousin was and instead said, "Yes, he wasn't calling me. Well, I'm going to call him." A reasonable jury could have inferred from this interaction that there was a previous relationship between Rosales and Christian.

Rosales asserts that there was no evidence of an established method of payment. But Christian had told Duran that someone in a Ram pick-up truck would give her $5,000. DEA task force officer Zint testified that his note from the phone call between Christian and Duran in which he had written down "elevated Ram P.U. $5,000," referred to a description of the contact's vehicle and that Duran was supposed to pick up $5,000. At the time of his arrest, Rosales had $5,000 cash in large bills in his pocket. Furthermore, a money order receipt found in Rosales' car listed Terry Tolle as the sender, the same individual Christian had told Duran would be transferring money to her for the transport on February 10.

The third *Deitz* factor, which looks at the standardization of transactions, also supports the conviction. Christian texted Duran the address and telephone number of a Comfort Inn, indicating that a previous drug transaction had taken place there and that the local contact "already know[s] which one it is."

Finally, the evidence arguably demonstrated that there was some level of trust involved in this transaction. The government estimated that the street value of methamphetamine is $60,000-$80,000 per kilogram and presented testimony that drug dealers often enter into fronting arrangements to accept drugs without any upfront payments. If Rosales was only going to pay $5,000 up front for drugs that were worth over $200,000, the jury could have interpreted that as a sign of the trust between him and Christian, lending further credibility to the conspiracy charge under the fourth *Deitz* factor.

Furthermore, this court has also found that "large quantities of drugs, such as a kilogram or more, support an inference of a conspiracy." *United States v. Lopez-Medina*, 461 F.3d 724, 748 (6th Cir. 2006). This case involves 4,427 grams of methamphetamine, which far exceeds the quantity a simple drug user would typically possess. The drug quantity therefore supports an inference of a conspiracy despite there only being a single transaction.

Rosales also argues that there was no evidence that he knew he was agreeing to violate drug laws. He suggests that while the evidence indicates he agreed to work with Duran and Christian, it does not demonstrate that he knew what he was agreeing to do involved a violation of drug laws. He relies on *United States v. Sliwo*, where this court overturned a conspiracy conviction where the defendant had assisted in moving a van before it contained drugs and had acted as a lookout. 620 F.3d 630, 633 (6th Cir. 2010). There, we found that the evidence "may be sufficient to show that Defendant had knowingly decided to work with his alleged co-conspirators, but it says nothing about whether Defendant knew that the ultimate purpose of the conspiracy was possession of marijuana." *Id* at 634.

Unlike in *Sliwo*, the facts of this case demonstrate Rosales' direct involvement with the drugs. First, when Duran spoke with Rosales, he attempted to confirm that "it's outside," which Duran testified she understood to be referring to the drugs. Rosales then proceeded to pick up the bag without waiting for Duran. Though Rosales claims that he had no knowledge of the drugs and was just trying to pick up Duran, a jury could reasonably conclude that his statements and conduct demonstrate that he was there primarily to pick up the bag rather than Duran. Furthermore, money order receipts that matched the name of the individual who had initially

wired money to Duran to facilitate the transport were found in the car Rosales was driving, further linking him to the conspiracy.

Rosales suggests that the fact that he had only a small amount of cash on him and in his house is evidence that he was unaware of the large quantity of drugs in the bag. This argument is also unavailing. As explained above, the government presented evidence to the jury that fronting arrangements are common in drug conspiracies. That no typical evidence of drug dealing was found at Rosales' house does not undermine the jury verdict because the government also provided testimony that drug dealers often use stash houses to conceal their activity.

Granted, there is no smoking gun evidence that confirms Rosales had knowledge that the duffel bag contained 4, 427 grams of methamphetamine, but such evidence is not needed to sustain a conviction. The circumstantial evidence presented at trial, especially when considered as a whole, would allow a reasonable jury to conclude that Rosales conspired and attempted to possess with intent to distribute the drugs. Rosales asserts that this evidence is insufficient because his defense theory that he was merely picking up an out of town visitor was just as likely to be true. However, suggesting an alternative explanation for the facts does not satisfy the "very heavy burden" of showing that even when "[a]ll reasonable inferences and resolutions of credibility are made in the jury's favor" the government's evidence was still insufficient. *United States v. Cox*, 871 F.3d 479, 490 (6th Cir. 2017) (citations omitted). It is not enough that Rosales proffered another theory to explain his conduct. A jury found him guilty beyond a reasonable doubt, and making all reasonable inferences in its favor, we do not second-guess its conclusion.

**B. JURY INSTRUCTION'S EFFECT ON SENTENCING**

We review jury instructions de novo. *United States v. Burchard,* 580 F.3d 341, 345 (6th Cir. 2009).

Because the offenses Rosales was charged under included a mandatory minimum of ten years if the drug quantity involved was 500 grams or more of methamphetamine, the parties agreed to use special verdict forms for both counts to calculate the drug quantities for the purposes of the statutory sentencing ranges under §§ 841(b)(1) and 846. *See Alleyne v. United States*, 570 U.S. 99, 103 (2013) (holding that any fact that increases the mandatory minimum is

an element that must be submitted to the jury). Based on a recent change in the Sixth Circuit pattern jury instructions, the government proposed that as to the conspiracy count, the jury be given a defendant-specific instruction rather than an instruction based on a conspiracy-wide Pinkerton[1] theory of liability. The proposed instruction would have required the jury to determine the amount of drugs that "resulted from the Defendant's own conduct and the conduct of other co-conspirators that was reasonably foreseeable to him." The district court rejected the proposed defendant-specific instruction and instead gave a conspiracy-wide instruction, stating that no evidence had been presented at trial that would indicate Rosales possessed anything less than 500 grams of methamphetamine. The district court acknowledged that its decision "may be proven to be error" and had a "full realization that [it] may be making a prejudicial error at least as far as sentencing is concerned."

Rosales argues that the conspiracy-wide instruction may have caused the jury to attribute a greater quantity of drugs to him. He suggests that if the jury had received the defendant-specific instruction, it may have found that less than the full 4,427 grams of methamphetamine was foreseeable to him.

In *United States v. Swiney*, we held that a district court must employ a defendant-specific approach for determining the extent to which a defendant charged under § 846 is subject to the penalties set forth in § 841(b) based on his co-conspirators' conduct. 203 F.3d 397, 406 (6th Cir. 2000). The *Swiney* court looked to the sentencing guidelines, which provide in U.S.S.G. § 1B1.3(a)(1)(B) that a defendant is subject to sentencing liability based on his own conduct and the conduct of his co-conspirators only to extent that the co-conspirator(s)' conduct was reasonably foreseeable to him. *Id.* at 402. Thus, in cases where the defendant could be criminally liable for the conduct of other conspirators, rather than giving a conspiracy-wide instruction, the court must use a defendant-specific instruction when instructing the jury to determine sentencing liability based on the quantity of drugs attributable to the defendant. *See Hamm*, 952 F.3d at 745–46.

---

[1]*See Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946) (holding that coconspirators can be liable for the ramifications of the conspiracy as a whole that were reasonably foreseeable as consequences of the unlawful agreement).

*Swiney* does not precisely apply to the case before us because it places limits on liability for the conduct of co-conspirators. As the government points out, "[h]ere, the only drugs at issue were the [4,427 grams] of methamphetamine that Duran was supposed to deliver." The jury found that Rosales attempted to possess with intent to distribute this same quantity of drugs. The jury also found that Rosales had entered into the conspiracy. Rosales argues that had the jury been given the defendant-specific instruction it could have found that Rosales was anticipating picking up a smaller quantity of drugs. But even under a defendant-specific approach, Rosales is responsible for all quantities with which he was directly involved. When the jury found Rosales guilty of the attempt to possess charge, it found he attempted to possess 4,427 grams of methamphetamine. This means that the jury found beyond a reasonable doubt that Rosales had the *mens rea* that 4,427 grams of drugs were in the duffel bag, which does not require that he personally knew, or reasonably foresaw, any specific quantity of methamphetamine. *See United States v. Dado*, 759 F.3d 550, 570 (6th Cir. 2014) (finding that "the penalty provisions of § 841(b) . . . require only that the specified drug types and quantities be involved in an offense" (citation omitted)); *see also United States v. Mahaffey,* 983 F.3d 238, 243 (6th Cir. 2020). Thus, because the jury found Rosales had attempted to possess 4,427 grams of methamphetamine when he picked up the duffel bag, it logically concluded that he was liable for that same amount under the conspiracy charge since that is the drug quantity he was directly involved with.

In other words, the jury found that Rosales was liable for the full quantity of drugs in the conspiracy. It is for this reason any error stemming from the failure to give a defendant-specific instruction was harmless. There was no possibility that the jury based the conspiracy quantity determination on the conduct of others not reasonably foreseeable to Rosales because the jury determined as part of the attempt charge that Rosales was responsible for 4,427 grams of methamphetamine. Thus, it necessarily determined that his role in the conspiracy involved that amount. "[A]n error is harmful as long as 'there is a reasonable possibility' that it 'might have contributed to the' result." *Hamm*, 952 F.3d at 748 (quoting *Chapman v. California*, 386 U.S. 18, 23 (1967)). For these reasons, while the district court erred in failing to provide defendant-specific jury instructions, the error was harmless because it could not have contributed to a different result.

## C. OBSTRUCTION OF JUSTICE ENHANCEMENT

"We review the district court's findings of fact for clear error but review de novo its determination whether specific facts constitute an obstruction of justice under the sentencing guidelines." *United States v. Williams*, 709 F.3d 1183, 1185 (6th Cir. 2013).[2]

As noted, the statutory sentencing range for both counts was a mandatory minimum of ten years to life. *See* 21 U.S.C. § 841(b)(1)(A)(viii). After applying the two-level enhancement for obstruction of justice, Rosales was determined to have a Category III criminal history and an adjusted offense level of 38. This resulted in a Guidelines range of 292 to 365 months' imprisonment. The district court found that this range was "more than needed to carry out the purposes of sentencing" and varied downwards to a sentence of 240 months' imprisonment. Without the obstruction of justice enhancement, the applicable Guidelines range would have been 235 to 293 months' imprisonment.

Under U.S.S.G. § 3C1.1, a two-level enhancement to the total offense level applies when the defendant has "willfully obstructed or impeded, or attempted to instruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." Where the evidence is destroyed contemporaneously with arrest, the enhancement does not apply unless it results in a "material hindrance" to the investigation or the sentencing of the defendant. *Id.* at cmt. n.4. The obstructing conduct relied upon by the district court was Rosales' destruction of his cell phone, and neither party disputes that Rosales spiked the phone on the ground contemporaneously with his arrest. Thus, for the enhancement to apply the district court had to find both "willfulness" and "material hindrance."

---

[2]This court has "sent mixed messages" as to whether application of the Guidelines to the facts is reviewed de novo or with "due deference" to the district court. *See United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019). For purposes of our case, it does not matter because the district court erred as a matter of law by failing to make the necessary factual finding on the record.

The district court must "indicate with specificity what facts [it] considered in reaching its offense level calculation." *United States v. Range*, 982 F.2d 196, 198 (6th Cir. 1992). Rosales asserts that the district court made conclusory findings untethered to specific facts. We disagree in part. In addressing "willfulness" the court found that "Defendant was not trying to avoid being shot but rather was trying to destroy the telephone, the cell phone, with which he and Monica Duran had been communicating for many hours since she left the bus station." The court emphasized that the phone was "thrown to the ground with sufficient force so as to make any information stored on the phone . . . impossible to retrieve." These findings easily satisfy the willfulness requirement of § 3C1.1.

On the other hand, the district court did not make any factual findings as to the material hindrance of the investigation.[3] Although the court noted that the phone would have reflected communication between Rosales and Duran, it did not discuss how not having the phone *materially* impeded the government's investigation.[4] The government asserts that the phone may have provided them with more information about the conspiracy and may have more concretely tied Rosales to Christian and the conspiracy itself. This may be true, but without a specific factual finding from the district court that Rosales' spiking of the phone materially hindered the investigation, the obstruction enhancement cannot be imposed. *See United States v. Kaminski*, 501 F.3d 655, 673 (6th Cir. 2007) (finding that a district court erred by applying an obstruction of justice enhancement when it found only willfulness and not that the conduct had actually significantly hindered the investigation); *see also United States v. Williams,* 952 F.2d 1504, 1516 (6th Cir. 1991) ("The focus of the guideline is on whether defendant . . . *succeeded* in significantly impeding the investigation."). Without this finding on the record, we cannot be certain that the district court correctly applied the obstruction of justice enhancement.

---

[3]This is somewhat understandable because Rosales did not specifically object to the enhancement on this basis. Indeed, his argument before the district court focused entirely on the "willfulness" issue.

[4]At trial, a law enforcement officer testified that he was not able to obtain information from the recovered parts of the phone. However, some information was able to be recovered from the administrative subpoena of the toll records. There was no testimony at trial regarding how the missing information materially hindered the investigation. The district court did not refer to the missing information testimony at sentencing at all, let alone indicate that it relied on it in applying the enhancement. Further, the PSR references that the destruction of the phone impeded the investigation, but it does not indicate that the impediment was material.

The question thus becomes whether the error was harmless.  Though the sentence imposed was within the correct Guidelines range absent the obstruction enhancement, we cannot be certain on this record that the district court would not have imposed a lower sentence had the Guidelines range been properly calculated because the district court did not indicate that it would have imposed a similar sentence absent the enhancement.  *See Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016) (finding that when a defendant is sentenced under an erroneously calculated Guidelines range "the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error"); *United States v. Collins*, 800 F. App'x 361, 362 (6th Cir. 2020) (explaining that this court has generally only found sentences based upon a miscalculated Guidelines range to be harmless error when a district court makes clear that it would have given the same sentence even without the enhancement the defendant seeks to challenge on appeal).

Our decision in *United States v. Buchanan* is instructive.  933 F.3d 501 (6th Cir. 2019). There the district court erroneously applied an enhancement that resulted in a Guidelines range of 63 to 78 months' imprisonment.  *Id* at 508.  Without the enhancement the Guidelines range would have been 51 to 63 months' imprisonment.  *Id* at 517.  Despite the fact that the district court varied downwards below the proper Guidelines range to 50 months, we still remanded for resentencing because the district court had not clearly indicated that it would have imposed the same sentence regardless of the applicable guideline range.  *Id.* at 517–518.

The district court sentenced Rosales near the bottom of the Guidelines range that would have been applicable without the enhancement because it felt that the higher range was "more than [was] needed to carry out the purpose of sentencing."  But we cannot say with certainty that it would have imposed the same sentence if it had *started* from that lower Guidelines range.  *See Molina-Martinez*, 136 S. Ct. at 1347 (finding that the Guidelines are a "starting point for the sentencing" and serve as a "focal point" for the proceedings that follow).  Though it seems likely that the district court may reimpose the same sentence given its decision to depart downwards, the burden of demonstrating certainty has not been met.  *See Collins*, 800 F. App'x at 364 (remanding when the district court "might well still impose a similar sentence").

For this reason, we remand to the district court for the limited purpose of reconsidering whether the obstruction of justice enhancement applies after making the necessary factual findings.  In doing so, "we seek to provide the court with an opportunity to develop, on the record, the precise reasons for its decision to apply the obstruction of justice enhancement." *Range*, 982 F.2d at 198.

## IV.  CONCLUSION

We **AFFIRM** as to the sufficiency of the evidence and the jury instructions, and **REMAND** for resentencing as it pertains to the obstruction of justice enhancement.