RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0247p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

　　　　　　*Plaintiff-Appellee*,

　　*v.*

MARK ANTHONY MOSLEY (21-1136); STACEY
PARCELL GIBSON (21-1404); TROY EDWARD BUSH (21-
1408); RICARDO MERCADO-LOZANO (21-2730),

　　　　　　*Defendants-Appellants*.

> Nos. 21-1136/1404/1408/2730

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:20-cr-00007—Paul Lewis Maloney, District Judge.

Argued:  July 21, 2022

Decided and Filed:  November 18, 2022

Before:  SUTTON, Chief Judge; KETHLEDGE and READLER, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Stephenie Lape Wolfinbarger, STEPHENIE LAPE WOLFINBARGER, PLLC,
Cincinnati, Ohio, for Appellant in 21-1136.  Timothy F. Sweeney, LAW OFFICE OF
TIMOTHY F. SWEENEY, Cleveland, Ohio, for Appellant in 21-1404.  Paul L. Mitchell, PAUL
L. MITCHELL, P.L.L.C., Grand Rapids, Michigan, for Appellant in 21-2730.  Vito S. Solitro,
UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.
**ON BRIEF:**  Stephenie Lape Wolfinbarger, STEPHENIE LAPE WOLFINBARGER, PLLC,
Cincinnati, Ohio, for Appellant in 21-1136.  Timothy F. Sweeney, LAW OFFICE OF
TIMOTHY F. SWEENEY, Cleveland, Ohio, for Appellant in 21-1404.  Paul L. Mitchell, PAUL
L. MITCHELL, P.L.L.C., Grand Rapids, Michigan, for Appellant in 21-2730.  Lawrence J.
Phelan, Walker, Michigan for Appellant in 21-1408.  Daniel T. McGraw, UNITED STATES
ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

　　　READLER, J., delivered the opinion of the court in which SUTTON, C.J., joined in full,
and KETHLEDGE, J., joined in part.  KETHLEDGE, J. (pp. 25–26), delivered a separate
opinion concurring in part and dissenting in part.

————————————

**OPINION**

————————————

CHAD A. READLER, Circuit Judge.   Troy Bush, Stacey Gibson, Ricardo Mercado-Lozano, and Mark Mosley challenge their respective convictions and sentences arising from a cocaine, fentanyl, heroin, marijuana, and methamphetamine drug distribution conspiracy.  We agree with Gibson that his post-conviction letter to the district court asserting a perfunctory denial of guilt was an improper basis to impose a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1.  Otherwise, we reject defendants' arguments and affirm their convictions and sentences.

I.

A few years ago, federal, state, and local law enforcement agencies began investigating Andrew Bravo for drug trafficking.  Over time, those investigatory efforts revealed that Bravo sat at the head of an interstate drug trafficking organization.  The organization operated as follows:  a contact in Mexico connected Bravo to drug suppliers, one of whom was Mercado-Lozano.  When Bravo received drugs from those suppliers, he would route them to associates for distribution.  Those associates included Bush, Gibson, and Mosley.

Each man played a different role within Bravo's organization.  Bush maintained one of Bravo's stash houses, tended to a marijuana grow on the property, and occasionally distributed drugs on Bravo's behalf.  Gibson was a street-level drug dealer who bought distribution quantities of cocaine from Bravo on five or six occasions.  Mercado-Lozano, a 14-year veteran of the Sinaloa Cartel, was one of Bravo's methamphetamine suppliers.  Mosley bought distribution quantities of cocaine, fentanyl, heroin, and marijuana from Bravo and sold them. After a two-year investigation, a federal grand jury indicted Bravo, Bush, Gibson, Mercado-Lozano, and Mosley for violating federal drug laws.  From there, defendants' prosecutions diverged. We take them in turn.

## II.  Bush

Bush's appeal takes aim at the second reauthorization of a wiretap used to collect evidence against Bravo's coconspirators, including Bush.

The grand jury charged Bush with three violations of federal criminal drug laws.  Much of the evidence the government relied on in pursuing those charges derived from a twice-reauthorized wiretap of Bravo's telephonic communications that captured conversations with and about Bush as well as other coconspirators.  Bush moved to suppress the wiretap evidence.  When that motion was denied, Bush agreed to plead guilty to a drug conspiracy count in exchange for dismissal of the other two counts.  In so doing, Bush preserved his right to appeal the suppression issue.

Consistent with his plea agreement, Bush asks us to answer one question:  did the district court abuse its discretion in reauthorizing the wiretap of Bravo's phone for the second time?  *See United States v. Gardner*, 32 F.4th 504, 514 (6th Cir. 2022).  In our view, it did not.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, regulates the government's use of wiretaps.  An application to intercept wire communications must, among other things, "include . . . a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  To satisfy this "necessity" requirement, the government must show (1) the wiretap is not the investigation's "initial step," (2) traditional techniques would not suffice, and (3) if investigators rely on prior experiences in explaining the inadequacy of traditional techniques, those experiences relate "to the particular facts of the investigation at hand."  *Gardner*, 32 F.4th at 515–17 (citation omitted).  And as the application here was a second request to extend a previously issued wiretap, a fourth mandatory showing applied:  the government's application needed to include any fruit borne by the initial wiretap or have reasonably explained why those efforts came up barren.  18 U.S.C. § 2518(1)(f).

In deeming the reauthorized wiretap necessary, the reauthorizing judge did not act outside of his "considerable" discretion in granting the government's request.  *United States v.*

*Young*, 847 F.3d 328, 343 (6th Cir. 2017) (quoting *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002)).  To begin, the reauthorization was not the investigators' "initial step." *Gardner*, 32 F.4th at 515.  Before seeking this wiretap, law enforcement agents had investigated Bravo and his cohort for over two years through physical surveillance, cooperating sources, telephone toll records, and GPS tracking devices, in addition to the deployment of two other previously approved wiretaps.

Despite using these timeless tools of policework, the team of investigators had more work to do.  Their goal was "to obtain evidence to fully prosecute all the members of" Bravo's organization.  The probe had identified several coconspirators.  Still, investigators had not yet sussed out all members of the conspiracy, identified Bravo's sources of supply and customers, or unearthed how Bravo was laundering drug money.

And traditional methods would not fill the gap.  The application detailed twelve categories of customary tools that law enforcement had considered and rejected as deficient.  Throughout, investigators connected their experience to the facts of the case they were building.  Physical surveillance would not suffice, for example, because of the likelihood of detection, difficulty in trailing Bravo's car, and isolated locations of some stash houses.  Bravo had also engaged in "cleaning," an evasive tactic known to investigators from previous work.  Making matters worse, confidential and cooperating sources had dried up.  Even where those sources had been interviewed, the information uncovered proved inadequate.  And undercover officers were a non-starter because Bravo kept a tight circle.  In short, the application drew upon specific factual elements of the investigation at hand in determining that traditional methods would not meet the investigation's unfulfilled goals.  Taking all of this together, the reauthorizing judge acted within his discretion in finding that the government had satisfied § 2518(1)(c)'s necessity and extension requirements.  *See id.* at 517–18.

Bush disagrees.  To his mind, necessity was lacking because, at the time of the second extension, the government had "largely achieved" or "arguably already acquired sufficient admissible evidence" to achieve its objectives.  This argument, however, effectively concedes the point. The necessity yardstick does not measure *how much* of the government's investigatory goals have been achieved.  It instead asks whether, as a binary matter, the government has met its

investigatory goals. *See id.* at 515 & n.1 (collecting "a litany of cases" rejecting arguments like Bush's). And by Bush's own characterization, it had not.

Bush points to § 2518(5)'s requirement that the wiretap terminate "upon attainment of the authorized objective[.]" Bush asserts that neither the government nor the district court abided by that limitation. Yet the record tells a different tale. The government explained in its wiretap application that its goal was "to obtain evidence to fully prosecute all the members of the BRAVO [organization]." The district court's wiretap authorization, in turn, aligned with that objective and accordingly with § 2518(5) by authorizing intercepts to continue "after the first interception" and "until all communications are intercepted" that "reveal fully the manner" of the conspiracy. We thus see no conflict between § 2518(5) and the wiretap reauthorization.

Finally, Bush asks that we construe § 2518 to require heightened scrutiny when the government seeks reauthorization of an existing wiretap. Yet Bush identifies no legal authority suggesting as much. Nor does he identify a textual basis for doing so. True enough, to satisfy § 2518 by its terms, the government's extension application must apprise the reviewing judge of the initial wiretap's fruits. *See* 18 U.S.C. § 2518(1)(f), (5). Here, however, there is no dispute that the government did so.

### III. Gibson

A. In his appeal, Gibson disputes both the sufficiency of the evidence supporting his conviction as well as his ensuing sentence.

The grand jury charged Gibson with one count each of conspiring to manufacture, distribute, and possess with intent to distribute controlled substances; and possessing cocaine with intent to distribute it. *See* 21 U.S.C. §§ 846, 841(a)(1). He pleaded not guilty and stood trial alongside Mercado-Lozano.

At trial, Bravo testified that he first became aware of Gibson when Bravo received a call asking to buy some ecstasy. During the conversation, the caller also mentioned to Bravo that Gibson wanted to buy a "nina," which he understood to mean nine ounces of cocaine. Bravo told the caller to give his phone number to Gibson. Two days later, Gibson called Bravo.

Gibson said that he was in "slow motion," which Bravo understood to mean that Gibson still needed to make additional money before buying the cocaine. Bravo responded that he would sell Gibson cocaine the following day. The next day, Bravo and Gibson exchanged texts and phone calls and agreed to meet. Because Bravo did not want Gibson to know where he lived, the pair met in a Planet Fitness parking lot. There, Bravo sold Gibson either 4.5 or 9 ounces of cocaine for $1,000 per ounce.

Less than 30 minutes later, Bravo texted Gibson to inquire about the cocaine's quality. Gibson described the cocaine as "beautiful" and asked to purchase another 4.5 ounces. Later that night, the two reconvened at Planet Fitness. Bravo sold Gibson 4.5 ounces of cocaine for an additional $4,500. Fifteen minutes later, Gibson texted Bravo to report that he had inadvertently shorted Bravo $2,500 and offered to repay him immediately. Despite testifying that he did not have a "good [enough] relationship with [Gibson] to front him drugs," Bravo declined Gibson's offer of immediate repayment. Minutes later, a wiretap recorded a phone call between the two to discuss the money that Gibson owed. At trial, Bravo told the jury that he was not worried about immediately recovering the cash because Gibson was "purchasing cocaine rapidly," meaning Bravo "knew [Gibson] would want more the next day."

Sure enough, Gibson called Bravo the next day to plan their third cocaine deal. Gibson told Bravo that he wanted to buy another 4.5 ounces of cocaine and would pay Bravo the outstanding $2,500, but that he would need about an hour to do so. Bravo believed that would be enough time for Gibson to resell the cocaine he had purchased, the proceeds of which Gibson could use to pay back the $2,500 he owed and to cover an additional purchase of cocaine. The pair then executed another cocaine deal in the Planet Fitness parking lot. The men consummated a few more deals over the next week or so. But Bravo stopped selling Gibson cocaine after Bravo began to observe law enforcement at some of their deals. When Gibson later attempted to contact Bravo, Bravo did not respond.

In all, Bravo testified that he sold cocaine to Gibson "a good five or six times" spread over a matter of weeks and that 4.5 ounces was the minimum increment he would sell to people he did not know well. Gibson paid in cash each time because, in Bravo's words, he "didn't have a . . . good relationship with [Gibson] to front him drugs."

At the close of the government's case, Gibson unsuccessfully moved for an acquittal under Federal Rule of Criminal Procedure 29. The jury later convicted Gibson of committing two crimes: drug conspiracy in violation of 21 U.S.C. § 846 and possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

The probation office's presentence report recommended a base offense level of 24 and a two-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice. To support the enhancement, the report cited a few sentences in a letter Gibson had sent to the district court following his conviction and the disclosure of his draft presentence report. Gibson's letter denied that he purchased cocaine from Bravo and asked the district court to consider this issue before sentencing.

With the obstruction enhancement, Gibson's offense level was 26. This, combined with Gibson's category II criminal history, produced a Guidelines range of 70 to 87 months' imprisonment. Gibson levied three objections to these calculations: (1) the obstruction enhancement, (2) the drug quantity, and (3) the denial of a minor role reduction. The district court overruled each objection and sentenced Gibson to 84 months' imprisonment.

B. On appeal, Gibson challenges the sufficiency of the evidence supporting his convictions as well the district court's Guidelines calculation. Save for Gibson's objection to the U.S.S.G. § 3C1.1 enhancement, none of his claims has merit.

1. *Sufficiency Of The Evidence.* Gibson believes that the government offered insufficient evidence to support his two convictions—one each for violating 21 U.S.C. § 841(a)(1) (possession with intent to distribute) and 21 U.S.C. § 846 (drug conspiracy).

As the jury concluded otherwise, Gibson's task is a tall one. He must convince us that "the government's case was so lacking that it should not have even been submitted to the jury." *Burks v. United States*, 437 U.S. 1, 16 (1978) (emphasis omitted). In conducting this legal inquiry, we construe the "evidence in the light most favorable to the prosecution." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We may not "weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006) (citation omitted). And the government need only put forth

enough evidence, circumstantial or otherwise, *United States v. Rosales*, 990 F.3d 989, 994 (6th Cir. 2021), for jurors to "draw reasonable inferences from basic facts to ultimate facts," *Jackson*, 443 U.S. at 319; *see also Rosales*, 990 F.3d at 994 (noting that the government need not "remove every reasonable hypothesis except that of guilt") (citation omitted).  Against this backdrop, we ask only whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original).

a.  *Possession With Intent To Distribute*.  Consider first Gibson's contention that the government failed to present sufficient evidence that he possessed cocaine with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1).  Bravo testified that Gibson intentionally purchased (and therefore possessed) distribution-sized quantities of cocaine on five or six occasions.  If credited, this would permit a rational juror to find each element of a § 841(a)(1) violation beyond a reasonable doubt.  *See United States v. Wettstain*, 618 F.3d 577, 587 (6th Cir. 2010) (explaining that a jury may find distributive intent when a defendant possesses a large quantity of drugs).  Gibson responds that we should not credit Bravo's testimony.  But we may not entertain that request on a sufficiency challenge.  *Paige*, 470 F.3d at 608.

b.  *Drug Conspiracy*.  Having affirmed Gibson's § 841(a)(1) distribution conviction, we turn to his conviction for joining Bravo's drug conspiracy, in violation of 21 U.S.C. § 846.  In its simplest form, a conspiracy is an agreement between two or more individuals to break the law. *See Iannelli v. United States*, 420 U.S. 770, 777–78 (1975).  As tailored to Gibson's case, a "completed" drug distribution conspiracy in violation of § 846 requires a showing that Gibson "knowing[ly] agree[d]" with another "to distribute drugs in violation of § 841(a)(1)." *United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021).  A § 846 conviction thus requires proof of two elements beyond a reasonable doubt:  (1) "two or more individuals have agreed to violate a drug law" and (2) Gibson "knowingly and voluntarily entered into this agreement." *Id.*; *cf. United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019) (acknowledging a sometimes-employed three-element framework with only "semantic difference").

i.  The first of the two conspiracy elements merits only brief discussion.  Bravo testified at length regarding agreements extending across his network of dealers and suppliers to

distribute drugs.    Seemingly for this reason, Gibson does not contest the existence of a conspiracy involving Bravo and other individuals.

Gibson's sufficiency challenge thus hinges on whether the government offered sufficient evidence that Gibson knowingly and voluntarily joined Bravo's conspiracy.  Once again, Gibson has a steep climb ahead.  With the government having established the existence of a drug conspiracy, its evidence linking Gibson to the conspiracy "need only be slight." *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006).  That is, the government must "demonstrate that [Gibson] had knowledge of the conspiracy's object and consciously committed himself to the furtherance of that object." *Id*.  In practice, that standard sets a relatively low bar for the government.  Gibson's agreement to join the conspiracy need not be "recorded or even express"; it can be inferred from his conduct. *Wheat*, 988 F.3d at 306–07.  Nor, for that matter, must he have formally agreed to break the law or been an "active participant in every phase of the conspiracy." *Paige*, 470 F.3d at 608–09.  It is enough for the government to show that Gibson took part in a "common plan" to distribute drugs. *Id*; *Wheat*, 988 F.3d at 306–07 (noting an "unspoken 'meeting of the minds'" to "jointly achieve a drug-distribution end" also suffices).

Did the evidence permit the jury to find beyond a reasonable doubt that Gibson knowingly joined Bravo's drug conspiracy?  We think so.  In this setting, as in others, we employ a totality of the circumstances test to assess whether a buyer of drugs knowingly joined the seller's conspiracy. *Wheat*, 988 F.3d at 309.  To give that nebulous standard some structure, we have recognized several non-exhaustive factors that, standing alone, may suggest the buyer and seller are coconspirators. *United States v. Deitz*, 577 F.3d 672, 681 (6th Cir. 2009).  Many of those factors are present here.

First, knowing entry into a drug conspiracy may reasonably be inferred when a buyer "repeated[ly] purchases . . . large quantities of drugs" from a single seller. *Wheat*, 988 F.3d at 308 (quoting *United States v. Sills*, 662 F.3d 415, 417 (6th Cir. 2011)); *see also United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014); *United States v. Anderson*, 89 F.3d 1306, 1310 (6th Cir. 1996).  That was the case for Gibson.  In recurrent transactions over just two weeks, Gibson bought 27 ounces (765 grams) of cocaine from Bravo for $27,000.  As a user dose of cocaine, the evidence revealed, can be as little as 0.1 grams, Gibson procured an enormous amount of

cocaine from Bravo—approximately 7,650 individual doses. *Cf. United States v. Hamm*, 952 F.3d 728, 737 (6th Cir. 2020) (describing 40 to 60 doses of fentanyl as a "large" quantity). That sort of repetitive, high-volume drug dealing would allow a rational juror to conclude that Gibson and Bravo tacitly agreed that Gibson would redistribute the cocaine. *See Wheat*, 988 F.3d at 308–09 (collecting cases). We have reached the same conclusion, it bears noting, in other conspiracy cases sharing analogous facts. *See, e.g.*, *United States v. Williams*, 998 F.3d 716, 726, 728–30 (6th Cir. 2021) (upholding conspiracy conviction where defendant purchased 150 counterfeit Percocet pills for distribution); *United States v. Martinez*, 430 F.3d 317, 334 (6th Cir. 2005) (defendant engaged in repeat drug transactions with other members of the conspiracy); *United States v. Brown*, 332 F.3d 363, 373 (6th Cir. 2003) (defendant had a "regular arrangement . . . to purchase very large quantities of powder cocaine"); *Anderson*, 89 F.3d at 1311–12 (defendant purchased approximately 0.6 kilograms of cocaine from members of the conspiracy and possessed a pager with the same area code as the conspiracy's headquarters); *United States v. Bourjaily*, 781 F.2d 539, 544–45 (6th Cir. 1986) (defendant executed one 1-kilogram cocaine deal).

The "standardized" nature of Bravo and Gibson's exchanges also suggests Gibson knowingly joined Bravo's conspiracy. *Wheat*, 988 F.3d at 309 (quoting *United States v. Thornton*, 822 F. App'x 397, 406 (6th Cir. 2020)); *see also United States v. Castro*, 960 F.3d 857, 865 (6th Cir. 2020) (noting that an "established procedure" for drug dealing supports the inference of conspiracy). Bravo sold Gibson cocaine five or six times, which Bravo suspected Gibson was reselling. Each sale was a cash deal conducted in the same Planet Fitness parking lot. And all were for quantities of cocaine in 4.5-ounce increments.

Indicia of "mutual trust" between Bravo and Gibson further support the same conclusion. *See Hamm*, 952 F.3d at 736 (quoting *Dietz*, 577 F.3d at 680–81). One indicator of trust in the drug conspiracy setting is when an individual "fronts" drugs to another person. *See, e.g.*, *United States v. Henley*, 360 F.3d 509, 514 (6th Cir. 2004). Placing conspiracy property in another's hands without prior payment, we have observed, may "suggest[] more than a buyer-seller arrangement between the parties." *Id.* (citation omitted); *Wheat*, 988 F.3d at 309. Mutual trust, however, may manifest itself in other, cases-specific ways, depending on the interactions

between the buyer and seller. *Wheat*, 988 F.3d at 309. Consider the facts of today's case. Although Bravo did not trust Gibson enough to front him drugs formally, Bravo essentially did the same when Gibson underpaid him by $2,500 during their second deal. Because Bravo had faith that Gibson would repay him after reselling the cocaine, he did not demand immediate payment. In this way, Bravo had a "stake" in the success of Gibson's cocaine distribution, if only for a short time. *See id.*; *see also Direct Sales Co. v. United States*, 319 U.S. 703, 713 (1943) (recognizing that a wholesaler of drugs had a "stake . . . in making the profits which it knew could come only from its encouragement of [another's] illicit operations"). And despite the underpayment, Bravo sold Gibson distribution quantities of cocaine three or four more times.

All said, the trial evidence permitted a rational juror to find beyond a reasonable doubt that Gibson knowingly joined Bravo's drug conspiracy. *Cf. DeLisle v. Rivers*, 161 F.3d 370, 389 (6th Cir. 1998) (en banc) (upholding conviction based entirely on circumstantial evidence). Gibson and Bravo's course of conduct presented familiar hallmarks of knowing participation in a drug conspiracy: large volume sales, repetitive dealing, standardized transactions, and some evidence of mutual trust. The scale and frequency of their cocaine exchanges were expansive enough for a rational juror to find that Gibson knowingly agreed to redistribute Bravo's cocaine. *See Rosales*, 990 F.3d at 994 (noting that the government need not "remove every reasonable hypothesis except that of guilt") (citation omitted).

ii. None of Gibson's arguments convince us otherwise. Gibson paints his connection to Bravo as simply a run-of-the-mill "arms-length buyer-seller relationship," not a conspiratorial arrangement. For instance, Gibson emphasizes that he was on the outs with Bravo after just a few weeks. Perhaps so. But Gibson's violation of § 846 was complete upon his joining Bravo's conspiracy, even if that conspiracy lasted only a matter of weeks. *See Wheat*, 988 F.3d at 306. Gibson aptly notes the absence of evidence indicating that he knew of or interacted with Bravo's coconspirators. Even so, that Gibson was "a party to the general conspiratorial agreement" suffices to sustain his conviction for conspiracy. *Paige*, 470 F.3d at 609. He need not have known or interacted with the conspiracy's other members. *Martinez*, 430 F.3d at 332–33.

Other evidence, we acknowledge, might lend itself to the inference that Bravo and Gibson had a tenuous, non-conspiratorial relationship. Case in point, Bravo testified that he was

not close enough with Gibson to front him drugs more so than he did and that neither man trusted the other with his home address.  Taking the fronting point first, those facts may help inform the broader inquiry into whether Bravo trusted Gibson enough to agree tacitly to distribute drugs.  But the absence of widespread fronting is not dispositive—we have upheld numerous conspiracy convictions where no fronting occurred whatsoever.  *See, e.g.*, *Castro*, 960 F.3d at 865; *Martinez*, 430 F.3d at 332–33.  And in any event, a rational juror could conclude that Bravo's reaction to Gibson underpaying him, which functioned as an informal fronting of drugs, evinces some trust between the two.

As to evidence reflecting Gibson's broader relationship with Bravo, including their unwillingness to share their home addresses, the jury was well situated to weigh that evidence with an eye to the practical realities of running a drug trafficking organization.  When assessing Gibson's guilt, for example, the jury may have considered that some amount of distrust naturally arises between two people aware that the other is willing to engage in felonious conduct.  The jury may have drawn an analogy to a conventional workplace, where many people likely work alongside coworkers whom they trust to pursue a common goal, but not enough to share their home address.  Or the jury may have considered the dangers of the drug trafficking world, including the reality that drug dealers' homes and stash houses—repositories for drugs and cash—are robbery targets.  *See, e.g.*, *United States v. Vichitvongsa*, 819 F.3d 260, 264–65 (6th Cir. 2016).

All said, Gibson and Bravo had good reason to refrain from sharing their addresses.  Neither man needed that information to fulfill his role in the conspiracy.  And gratuitously sharing one's address could have been unwise when one considers that a coconspirator, if apprehended, might reveal the conspiracy's inner workings.  *See, e.g., United States v. Anderson*, 747 F.3d 51, 73 (2d Cir. 2014) ("[A] conspiracy by its very nature is a secretive operation[.]" (internal quotation marks and citation omitted)).  Conspiracies, in other words, often work best in secret.  Long story short, whether Bravo and Gibson shared their addresses does not fully answer whether the two trusted one another enough to work toward a general drug distribution end.  In view of the entire record, we do not see how Gibson's and Bravo's arguably unforthcoming behavior precluded the jury from finding that Gibson "knowingly and voluntarily entered into"

Bravo's drug distribution conspiracy, *Wheat*, 988 F.3d at 306, particularly in light of the mammoth quantities of cocaine changing hands.

Gibson has two remaining arrows in his quiver. First, he invokes several out-of-Circuit cases holding that "large quantities of controlled substances, without more, cannot sustain a conspiracy conviction." *See, e.g.*, *United States v. Lennick*, 18 F.3d 814, 819 n. 5 (9th Cir. 1994) (citation omitted); *United States v. Lechuga*, 994 F.2d 346, 347 (7th Cir. 1993) (citation omitted). But our Court, as reflected in *Wheat* and elsewhere, sees things differently. 988 F.3d at 308. Time and again, we have explained that repetitive, high-volume drug dealing allows a rational trier of fact to find that the buyer and seller have a "tacit agreement for the buyer to resell the drugs to downstream customers." *See id.* at 308–09 (collecting cases).

Finally, Gibson contends that the evidence supporting his conviction is insufficient under the contours articulated in *Wheat*. 988 F.3d at 309–11. *Wheat* thoughtfully applied the longstanding rule that "a buyer-seller relationship is not alone sufficient to tie a buyer to a conspiracy." *United States v. Grunsfeld*, 558 F.2d 1231, 1235 (6th Cir. 1977) (per curiam); *see Wheat*, 988 F.3d at 307. That rule, *Wheat* explained, is a permutation of Wharton's Rule, the common law doctrine which instructs "that two parties cannot conspire to commit a substantive crime when the crime *itself* requires two parties for its completion." *Wheat*, 988 F.3d at 307–08 (emphasis in original). At the same time, *Wheat* also emphasized the rule's "narrow domain." *Id.* at 308. That is, the government may step outside the rule's reach with evidence that the buyer and seller agreed to commit a drug crime beyond their initial transaction. *Id.* On that score, consider the differences between defendants Wheat and Gibson. Wheat engaged in a one-time delivery of a 0.3-gram sample of heroin to a prospective buyer. *Id.* at 304. Gibson, on the other hand, purchased 765 grams of cocaine—at least 2,500 times the user doses at issue in *Wheat*—spread across five or six transactions within a few weeks. Purchasing massive quantities of cocaine over a meager period of time makes it eminently reasonable for the jury to have concluded that Gibson contemplated downstream drug sales, a factor absent in *Wheat*. We therefore affirm Gibson's drug conspiracy conviction.

2. *Procedural Reasonableness.* Shifting gears, Gibson submits that his 84-month sentence is procedurally unreasonable. To impose a procedurally reasonable sentence, a district

court "must properly calculate the guidelines range, treat that range as advisory, consider the sentencing factors in 18 U.S.C. § 3553(a), refrain from considering impermissible factors, select the sentence based on facts that are not clearly erroneous, and adequately explain why it chose the sentence." *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018). Gibson asserts three procedural reasonableness challenges. As he preserved each one, we review for an abuse of discretion. *United States v. Hymes*, 19 F.4th 928, 932–33 (6th Cir. 2021). We examine the district court's ultimate Guidelines calculation de novo and its underlying factual findings for clear error. *United States v. Meek*, 32 F.4th 576, 579 (6th Cir. 2022). On the latter consideration, a factual finding is clearly erroneous when a review of the entire record leaves us with "the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. Fleischer*, 971 F.3d 559, 567 (6th Cir. 2020)).

a.   *Obstruction Enhancement*.  Gibson first argues that the district court improperly increased his offense level for obstruction of justice pursuant to U.S.S.G. § 3C1.1. That enhancement was imposed because Gibson sent a post-conviction letter to the district court denying that he purchased cocaine from Bravo.

We assume, as we have before, that whether a defendant obstructed justice or attempted to do so is a mixed question of law and fact. *See United States v. Wellman*, 26 F.4th 339, 354 (6th Cir. 2022). Underlying that mixed question are "mixed messages" as to the appropriate standard of review. *Rosales*, 990 F.3d at 998 n.2 (describing our intra-circuit split). Yet we need not explore that jurisprudential thicket here because, to our minds, the district court's imposition of the § 3C1.1 enhancement was improper under any standard of review.

Section 3C1.1 provides for a two-level increase in a defendant's offense level when "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the . . . sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. The enhancement applies when a defendant commits any act that "blocks, makes difficult, or hinders" a sentencing (or attempts to do so). *United States v. Thomas*, 933 F.3d 605, 610 (6th Cir. 2019) (quoting *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018)) (cleaned up). Taken at face value, that description can encompass instances where a defendant makes a false statement to a judge during the sentencing phase—the conduct that served as the basis for

Gibson's enhancement.  *See United States v. Sweet*, 630 F.3d 477, 483–84 (6th Cir. 2011); *see also* U.S.S.G. § 3C1.1 cmt. n.4(F).

But there is more to consider.  Section 3C1.1 comes with commentary from the Sentencing Commission observing that a perfunctory denial of guilt, without more, is beyond the enhancement's scope unless it constitutes perjury.  U.S.S.G. § 3C1.1 cmt. n.2, n.4(F), n.6.  The Guidelines interpretive commentary is inapplicable, we have previously explained, if it is "plainly erroneous or inconsistent with" § 3C1.1.  *United States v. Havis*, 927 F.3d 382, 386 (6th Cir. 2019) (en banc) (per curiam) (quoting *Stinson v. United States*, 508 U.S. 36, 45 (1993)).  But as neither party argues that is the case here, "we may assume that the commentary permissibly interprets" § 3C1.1, leaving any interpretive questions for another day.  *United States v. Hill*, 963 F.3d 528, 531–32 (6th Cir. 2020).

Section 3C1.1's exclusion of perfunctory denials of guilt speaks to today's case.  The relevant portion of Gibson's letter was brief.  There, Gibson asserted that he had neither purchased cocaine from Bravo nor asked Bravo to sell him cocaine.  He then asked the district court to consider his innocence at sentencing.  Fairly put, Gibson merely denied the acts establishing his possession with intent to distribute conviction, consistent with what he had maintained throughout trial.  From beginning to end, in other words, Gibson simply denied his guilt.  His letter is better read to reflect his continued disgust with the verdict rather than an instance of perjury.  The district court thus erred by applying the § 3C1.1 enhancement.  U.S.S.G. § 3C1.1 cmt. n.2.

The government cites two decisions it says point the other way.  One is *United States v. Aideyan*, 11 F.3d 74 (6th Cir. 1993).  *Aideyan* concludes that "false statement[s] made at a sentencing hearing regarding information that is relevant to sentencing [are] material and nontrivial for purposes of § 3C1.1."  *Id.* at 76.  True enough.  *Sweet*, 630 F.3d at 484.  But we must decide the specific question of whether Gibson's denial of guilt could qualify as a basis for the § 3C1.1 enhancement.  And the commentary to § 3C1.1, again, says it does not.

The other decision is not our own; it comes from the First Circuit.  *See United States v. Olea*, 987 F.2d 874, 877 (1st Cir. 1993).  In *Olea*, the First Circuit affirmed application of the

§ 3C1.1 enhancement when, after pleading guilty in exchange for dismissal of some charges against him, the defendant falsely denied participation in the dismissed charges and minimized his role in the offense of conviction. *Id.* at 877–88. But unlike Olea, Gibson pleaded not guilty. And he went to trial, where he also denied guilt of the offenses for which he was ultimately convicted. That is worlds apart from attempting to walk back an in-court admission of guilt.

That said, our holding is quintessentially fact specific. Behavior that exceeds the narrow tolerance § 3C1.1 establishes for mere denials of guilt may well justify the enhancement. To that end, we understand the difficult position that, as here, a district court faces in sizing up a defendant's letter at sentencing. A defendant's materially false statements may "obstruct or impede" sentencing by requiring government time and resources to disprove them. *Thomas*, 933 F.3d at 610–11; *see, e.g., United States v. Bailey*, 973 F.3d 548, 572 (6th Cir. 2020) (upholding application of the § 3C1.1 enhancement where a defendant's false statement "would tend to influence or affect the issue under determination" (quoting U.S.S.G. § 3C1.1 cmt. n.6)). Equally true, a sentencing judge who believes a materially false statement may impose a shorter sentence than appropriate. *See Thomas*, 933 F.3d at 611. Long story short, a defendant who sends a similar letter in slightly changed circumstances does so at his peril. *See id.* at 610.

b. *Drug Quantity*. Next, Gibson submits that the district court erred in calculating his Guidelines range by finding that Gibson's crimes involved at least 27 ounces of cocaine. Some basic ground rules guide our review of this issue. To begin, when the evidence of drug quantity is inconclusive, a district court should "err on the side of caution" and "only hold the defendant accountable for a specific quantity for which he is more likely than not actually responsible." *United States v. Johnson*, 732 F.3d 577, 581 (6th Cir. 2013) (citing *United States v. Walton*, 908 F.2d 1289, 1301, 1302 (6th Cir. 1990)). But an estimate of the drug quantity is sufficient when the estimate is supported by a preponderance of the evidence. *Id.* And in making that estimate, the district court may rely on coconspirator testimony. *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008). If it does so rely, we afford great weight to the district court's credibility determinations. *United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir. 2007). Beyond that, we review the district court's drug quantity finding for clear error. *United States v. Smith-Kilpatrick*, 942 F.3d 734, 746 (6th Cir. 2019).

At Gibson's sentencing, the district court found that his offense involved at least 27 ounces of cocaine, which yielded a base offense level of 24. This reasoned estimate follows from Bravo's testimony that he sold Gibson cocaine at least "a good five or six times," which included several 4.5-ounce sales and one sale between 4.5 and 9 ounces. As Bravo was Gibson's coconspirator, the district court did not err by relying on Bravo's testimony to calculate drug quantity. *Jeross*, 521 F.3d at 570. Nor was there an error in the district court's math. True, the district court did not expressly find that six 4.5-ounce cocaine deals took place. But its finding of at least 27 ounces of cocaine survives clear error review because Bravo testified to once selling Gibson either 4.5 or 9 ounces of cocaine. (For reference: $27 = 4.5 \times 6$; $27 = 4.5 \times 4 + 9$.)

Gibson counters that the only cocaine quantity proven by a preponderance was 13.5 ounces. He says that is so because Bravo recounted only three 4.5-ounce sales with "any degree of specificity." Gibson thus believes that his base offense level should have been 20, not 24. We see this argument for what it is: a credibility challenge. Remember, Bravo testified to selling Gibson at least 4.5 ounces of cocaine "a good five or six times." And the district court, after hearing Bravo's live testimony, found him credible. Mindful of the great weight we attach to the district court's credibility determination, we conclude that its estimate was not clearly erroneous. *Johnson*, 732 F.3d at 582. At day's end, the district court's 27-ounce finding was a plausible conclusion to draw from the record as a whole. *Id.* at 582.

c. *Minor Role Reduction.* Gibson closes by contesting the district court's failure to grant him a two-level minor role reduction under U.S.S.G. § 3B1.2(b). A § 3B1.2(b) reduction is appropriate where the defendant "was a minor participant in any criminal activity." U.S.S.G. § 3B1.2(b). The Guidelines commentary, in turn, states that the reduction applies when the defendant is "*substantially* less culpable than the average participant" in the offense. *Id.* cmt. n.3(A) (emphasis added). But a defendant becomes more culpable when he (even unsuccessfully) seeks a larger role in the conspiracy, making the reduction inappropriate. *United States v. Gabbard*, 586 F.3d 1046, 1052 (6th Cir. 2009) (per curiam). In district court, Gibson bore the burden to demonstrate his minor role by a preponderance of the evidence. *United States v. Daneshvar*, 925 F.3d 766, 790 (6th Cir. 2019). Because we review the denial of a mitigating

role reduction for clear error, the district court has a wide berth in resolving the matter. *United States v. Lanham*, 617 F.3d 873, 888 (6th Cir. 2010).

The district court did not run aground in doing so. It reasoned that the quantities of cocaine Gibson purchased from Bravo made him a run-of-the-mill participant in the conspiracy. The district court further observed that Gibson was no minor participant because he repeatedly tried to contact Bravo even after Bravo broke off their relationship. Viewing Gibson's behavior in context, the district court inferred that Gibson aspired to a more sizeable drug distribution relationship with Bravo. In these ways, the district court concluded, Gibson had not met his burden to show that he was substantially less culpable than Bravo's other coconspirators. All things considered, we see no clear error in this conclusion. *See Gabbard*, 586 F.3d at 1052 (affirming denial of the U.S.S.G. § 3B1.2(b) reduction when a defendant, though less culpable than some coconspirators, attempted to enlarge his role in a drug conspiracy).

Gibson responds that the district court clearly erred by failing to consider various factors set forth in the commentary to § 3B1.2(b). In particular, he takes issue with the lack of findings as to his knowledge of the conspiracy's scope and structure, his role in planning the criminal activity, and his decisionmaking authority. By and large, however, these factors do not favor Gibson. Yes, there is little evidence as to what Gibson knew of Bravo's broader organization. Yet Gibson's own role—his purchase of the equivalent of 7,650 user doses of cocaine—was hardly insignificant. Bravo's testimony and phone logs, moreover, demonstrated Gibson's involvement in planning repeated sales at the Planet Fitness parking lot, a location Gibson selected, as well as Gibson's authority to initiate each deal. In view of these facts, the district court's denial of a minor role reduction was not clearly erroneous.

## IV. Mercado-Lozano

A. Mercado-Lozano's appeal challenges both the sufficiency of the evidence supporting his drug conspiracy conviction as well as the substantive reasonableness of his within-Guidelines 292-month sentence.

The grand jury indicted Ricardo Mercado-Lozano for conspiring to manufacture, distribute, and possess with intent to distribute 500 grams or more of cocaine. *See* 21 U.S.C.

§§ 846, 841(a)(1), (b)(1)(B)(ii).   At trial, cartel-affiliated drug distributor Arnulfo Licea Sandoval testified as to Mercado-Lozano's body of work for the Sinaloa Cartel.  According to that testimony, Licea sent Mercado-Lozano 10-to-20-pound packages of crystal methamphetamine between four and six times, which Mercado-Lozano then sold.  On one occasion, Licea traveled to Indiana, picked up 15 to 20 pounds of crystal methamphetamine from Mercado-Lozano, drove to Minnesota, and sold it.  On another occasion, Mercado-Lozano rendezvoused with Licea in California and discussed distributing methamphetamine across the Midwest.

Bravo also testified against Mercado-Lozano.  He described Mercado-Lozano as one of his main drug suppliers.  And the amounts of these supplies were not inconsequential.  Bravo purchased one to two kilograms of cocaine at a time from Mercado-Lozano.  He also bought two to five pounds of methamphetamine from Mercado-Lozano on "a few" occasions.  Bravo added that the $30,000 found in Mercado-Lozano's car at the time of Mercado-Lozano's arrest was cash that Bravo had paid for a kilogram of cocaine.

The jury convicted Mercado-Lozano of the conspiracy charge.  Before sentencing, the probation office calculated his offense level as 38 with a criminal history category III, yielding a Guidelines range of 292 to 365 months.  Accepting those calculations, Mercado-Lozano requested a downward variance from the Guidelines range due to Bravo's 22-year sentence, the fact that his conviction would result in deportation, and the possibility he would die in prison while serving out a lengthy sentence.  The district court rejected each argument and sentenced Mercado-Lozano to 292 months' imprisonment.

B. 1.   Mercado-Lozano maintains that the trial evidence was insufficient to support his drug conspiracy conviction.  To convict Mercado-Lozano of a drug conspiracy, the government needed to prove two elements beyond a reasonable doubt:  (1) that "two or more individuals . . . agreed to violate a drug law" and (2) Mercado-Lozano "knowingly and voluntarily entered into this agreement."  *Wheat*, 988 F.3d at 306.  In assessing the trial record, our review is narrow in scope.  We examine the record to determine whether "*any* rational trier of fact" could have found that the government proved beyond a reasonable doubt the two elements of the conspiracy charge.  *Jackson*, 443 U.S. at 319 (emphasis in original).  In making that assessment, we neither

reweigh the evidence nor second-guess the jury. *Id.*; *see Paige*, 470 F.3d at 608. In Mercado-Lozano's case, the hill before him is even steeper: because he failed to move for an acquittal at trial, we must reject his sufficiency challenge unless his conviction amounts to a "manifest miscarriage of justice." *United States v. Sherer*, 770 F.3d 407, 411 (6th Cir. 2014) (quoting *United States v. Tragas*, 727 F.3d 610, 617 (6th Cir. 2013)). For that to be so, Mercado-Lozano must demonstrate that the record is "devoid of evidence pointing to guilt." *Tragas*, 727 F.3d at 618 (citation omitted).

Like Gibson, Mercado-Lozano concedes the existence of Bravo's distribution conspiracy. But he disputes that he voluntarily participated in it, maintaining that he joined due to fear of the cartel. His willing involvement in the cartel, however, is well supported by the evidence. Multiple witnesses testified to Mercado-Lozano's extensive role in the cartel's operations: an investigating agent said that Mercado-Lozano admitted to working for the cartel for 14 years in at least four states; Licea told the jury about his monthslong stint sending 10-to-20-pound packages of crystal methamphetamine to Mercado-Lozano for resale; and Bravo testified to purchasing more than $30,000 of cocaine from Mercado-Lozano. Another government witness with expertise in the drug trade testified that he could not think of an instance of someone working for a cartel for 14 years without an opportunity to get out. Based on the length and extent of Mercado-Lozano's history with the cartel, a rational juror could reasonably infer that he was a voluntary participant.

2. Next, Mercado-Lozano contends that his 292-month prison sentence is substantively unreasonable. In essence, this is an argument that his sentence is too long due to the district court improperly weighing the statutory sentencing factors set forth in 18 U.S.C. § 3553(a). *United States v. Milliron*, 984 F.3d 1188, 1195–96 (6th Cir. 2021). We review for an abuse of discretion. *Hymes*, 19 F.4th at 932–33. And we presume Mercado-Lozano's 292-month sentence is substantively reasonable because it falls within his Guidelines range (292 to 365 months). *United States v. Michael*, 576 F.3d 323, 329 (6th Cir. 2009); *cf. Rita v. United States*, 551 U.S. 338, 347 (2007) (permitting this presumption).

That presumption is well founded. In keeping with the requirements of § 3553(a), the district court at sentencing highlighted the "grave" nature of Mercado-Lozano's drug trafficking.

Mercado-Lozano was a longtime participant in organized crime, personally distributing dozens of kilograms of methamphetamine and cocaine. With that record in mind, the district court expressed "severe doubts" about Mercado-Lozano's ability to refrain from criminal activity, citing his continued trafficking after a December 2018 raid of his home. The court likewise noted the "scourge" that methamphetamine imposed on the Western District of Michigan. All said, the district court acted within its discretion. *See Michael*, 576 F.3d at 329.

Mercado-Lozano responds with two counterpoints: (1) a 10:1 ratio in the Guidelines treatment of pure versus mixed methamphetamine arbitrarily augmented his sentence; and (2) his codefendants received shorter sentences. Together, he says, these flawed considerations left him with a "life sentence" due to his age (48) and purported life expectancy (68.8 years).

Neither point has salience. His challenge to the 10:1 methamphetamine-mixture ratio amounts to little more than a policy disagreement with the Guidelines, which the district court had discretion to reject. *United States v. Johnson*, 812 F. App'x 329, 334–35 (6th Cir. 2020) (citing *United States v. Lynde*, 926 F.3d 275, 281 (6th Cir. 2019)). Likewise, any disparity between Mercado-Lozano's sentence and those of his codefendants is legally unremarkable, for at least two reasons. One, § 3553(a) requires consideration of national sentencing disparities, not those among codefendants. *United States v. Houston*, 529 F.3d 743, 752 (6th Cir. 2008); 18 U.S.C. § 3553(a)(6). Two, his codefendants received within-Guidelines sentences commensurate with their own crimes and criminal histories. The lone exceptions were for individuals like Bravo who, unlike Mercado-Lozano, admitted guilt, pleaded guilty, and cooperated, and thus benefitted from U.S.S.G. § 5K1.1 motions. Any disparity here, in other words, was well grounded. *United States v. Conatser*, 514 F.3d 508, 522 (6th Cir. 2008).

## V. Mosley

Mosley's appeal challenges his sentence imposed by the district court.

In exchange for dismissal of other charges against him, Mosley agreed to plead guilty to one count of conspiracy to manufacture, distribute, and possess with intent to distribute cocaine, fentanyl, heroin, marijuana, and 50 grams or more of methamphetamine. In his plea agreement, Mosley waived his right to appeal his sentence subject to a handful of exceptions, one of which

is relevant here. That exception allows Mosley to argue that the district court "incorrectly determined the Sentencing Guidelines range," but only if he objected at the sentencing hearing on that basis.

For purposes of calculating Mosley's Guidelines range, the probation office placed him in criminal history category IV and proposed an offense level of 33 for his crime. The proposed offense level incorporated a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possessing a firearm during the drug conspiracy. The resulting Guidelines calculation ranged from 188 to 235 months' imprisonment. Mosley objected to the firearm enhancement and moved for a downward variance on the basis that the criminal history category IV overstated his propensity for crime.

At Mosley's sentencing hearing, the district court heard testimony regarding the firearm enhancement. A detective present when officers found the firearm at issue—a .22 caliber Ruger handgun—testified that the Ruger was in a closet in Mosley's girlfriend's basement. According to the detective, the gun was inches away from two bags of a heroin-fentanyl mixture and about a foot and a half away from a tee shirt press covered with cocaine and methamphetamine residue. The gun was unloaded, and agents found no ammunition.

Mosley's girlfriend also testified. She said that he returned home a week or two before the raid, at which point he gave her the Ruger as a present. Mosley encouraged her to keep the gun in her bedroom for protection. But as she was apprehensive about having the Ruger near her kids, Mosley took it to the basement. Mosley's girlfriend also testified that the drugs and drug paraphernalia in the basement did not belong to her.

In the end, the district court adopted the probation office's recommended Guidelines range of 188 to 235 months and sentenced Mosley to 200 months' imprisonment. Mosley now protests the district court's imposition of the firearm enhancement as well as the overall length of his sentence.

Because Mosley lodged his firearm enhancement objection to the district court's Guidelines range calculation at sentencing, that challenge is not waived. So we turn our attention to § 2D1.1(b)(1), which requires a district court to increase a drug defendant's offense

level by two "[i]f a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1). The enhancement applies when the government establishes by a preponderance of the evidence that (1) the defendant actually or constructively possessed the dangerous weapon (2) during the offense. *United States v. West*, 962 F.3d 183, 187 (6th Cir. 2020) (citing *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996)); *United States v. McCloud*, 935 F.3d 527, 531 (6th Cir. 2019).

Mosley largely admits that he possessed the Ruger, so we turn our attention to assessing whether he did so during the conspiracy offense. Six factors bear on that determination: (1) the type of gun Mosley possessed, (2) its accessibility, (3) the presence of ammunition, (4) the gun's proximity to illegal drugs, cash, or drug paraphernalia, (5) evidence that Mosley used the weapon, and (6) whether Mosley was engaged in drug trafficking, rather than manufacturing or possession. *United States v. Pryor*, 842 F.3d 441, 453 (6th Cir. 2016) (quoting *United States v. Greeno*, 679 F.3d 510, 515 (6th Cir. 2012), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022)). As this is a question of law, we review the district court's determination de novo. *West*, 962 F.3d at 187–88.

The district court concluded that these factors "heavily . . . favor[ed]" application of the enhancement. It is easy to see why. The Ruger was a small pistol that was not difficult to conceal, which, as a government witness testified, made it practical for use by a drug trafficker. Agents found the Ruger in Mosley's workshop in the basement of his girlfriend's home. Mosley's girlfriend testified that he had brought the gun there, confirming his access to it. The Ruger was inches away from Mosley's fentanyl stash and only a foot and a half away from the drug residue on the tee shirt press. True, the absence of ammunition favors Mosley. Yet that fact stands in the shadow of the mountain of evidence supporting the enhancement. *United States v. Chalkias*, 971 F.2d 1206, 1217 (6th Cir. 1992) (per curiam) (affirming application of the enhancement where the only fact weighing in the defendant's favor was the absence of ammunition). All things considered, the district court did not err in applying the enhancement.

That leaves Mosley's substantive reasonableness claim. Yet the claim has a threshold flaw: Mosley does not assert as part of his argument that the district court "incorrectly

determined the Sentencing Guidelines range." As a result, his challenge does not fall within the scope of exceptions to his appeal waiver.

Seeing his case as analogous to *United States v. Tice*, 366 F. App'x 569 (6th Cir. 2010), however, Mosley responds by urging us to expand the meaning of his waiver exception. Tice's plea agreement also waived his appeal rights, except as to the district court's "adverse determination of any disputed guideline issue." *Id.* at 570. We held that Tice could advance a substantive reasonableness claim on appeal despite the waiver because the question of his criminal history category counted as a "disputed guideline issue." *Id.* at 572. Setting aside the fact that Mosley concedes that his criminal history calculation was "objectively correct," *Tice* is no refuge for him. After all, the exception to his general appeal waiver covers only the Guidelines range calculation, not the selection of a sentence once that range is calculated. *Cf. United States v. Hollins-Johnson*, 6 F.4th 682, 684 (6th Cir. 2021). And as the exception's plain text does not cover Mosley's substantive reasonableness argument, we cannot consider it.

## VI.

To sum up, we affirm the denial of Troy Bush's motion to suppress, affirm Ricardo Mercado-Lozano's conviction and sentence, and affirm Mark Mosley's sentence. We also affirm Stacey Gibson's conviction, but we vacate his sentence and order a limited remand for purposes consistent with this opinion.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

KETHLEDGE, Circuit Judge, concurring in part and dissenting in part. Although I join most of the majority's well-crafted opinion, I respectfully disagree that the evidence at trial was sufficient to support Stacey Gibson's conspiracy conviction. As an initial matter, I agree with the majority that the government proved the existence of a conspiracy "extending across [Bravo's] network of dealers and suppliers to distribute drugs." Op. at 8-9. I also agree that the government proved that Gibson himself possessed cocaine—namely the cocaine he bought from Bravo—with the intent to distribute it. What the government did not prove, however, is that Gibson agreed to advance Bravo's network-wide conspiracy.

"Generally, a buyer-seller relationship alone is insufficient to tie a buyer to a conspiracy[.]" *United States v. Deitz*, 577 F.3d 672, 680 (6th Cir. 2009). A buyer-seller relationship is what the government proved here: Gibson bought about 18 ounces of cocaine from Bravo in three transactions during a 48-hour period. When asked whether he sold drugs to Gibson on other occasions, Bravo testified, "I'm not exactly sure"; but when further prompted (with a leading question) by the government, Bravo said that he sold cocaine to Gibson two or three more times during the following week or so. The question, then, is whether the government's proof at trial made this case the exceptional one where a buyer-seller relationship *is* sufficient to tie the buyer to a larger conspiracy.

On that score, the government points to the number of transactions between Bravo and Gibson—five or six, construing the record very much in the light most favorable to the government—and the total quantity of cocaine sold in those transactions, about 27 ounces. But if that is proof enough here, then any buyer-seller relationship between dealers is enough to show that the buyer agreed to join the seller's network-wide conspiracy. Not even the government advocates that rule. *See United States v. Colon*, 549 F.3d 565 (7th Cir. 2008).

Meanwhile, in this case, the other "'factors' that allow a jury to find an agreement between a buyer and seller to go beyond their own sale" all point affirmatively the other way.

*United States v. Wheat*, 988 F.3d 299, 308 (6th Cir. 2021).  One such factor is "evidence of an enduring arrangement" between the buyer and seller, *id.* at 309; here, at most, the arrangement endured for all of ten days.  Another factor is evidence revealing "a level of trust that is unusual for a buyer-seller relationship alone."  *Id.*  Bravo expressly testified that the opposite was true with Gibson:  "I didn't trust him to know where I lived" and "[h]e didn't trust me."  Another factor is evidence that the buyer and seller "engaged in 'standardized' transactions, acting with a level of efficiency more inherent in a vertically integrated enterprise than in random 'spot' sales."  *Id.*  But here Bravo testified that he and Gibson did their deals in a Planet Fitness parking lot only because neither trusted the other enough to do the deals at one of their homes.

Yet another factor is whether the seller "often 'fronts' drugs" to the buyer.  *Id.*  Again Bravo testified that the opposite was true here:

Q: Did he pay you up front or did you front him these drugs?

A: He pays me up front.

Q: He always pays you up front?

A: Yes.

Q: Why is that?

A: I didn't have a, you know, good relationship with him to front him drugs.

In response to this point, the government points to Bravo's second sale to Gibson, in which Gibson inadvertently paid Bravo $2,500 less than the sale price.  In a text exchange immediately afterward, Bravo told Gibson that "I'll get it from you" in their drug deal the next morning.  That the government cites that exchange as evidence of Bravo "fronting" drugs to Gibson only underscores the weakness of its case.  Nor is this exchange even arguably evidence that Bravo "often" fronted drugs to Gibson.  *Id.*

Deferential review is review nonetheless.  Here, the government proved only a buyer-seller relationship between Bravo and Gibson.  The other relevant "factors"—per the testimony of the government's own witness, Bravo—affirmatively confirm as much.  I would reverse Gibson's conspiracy conviction.