NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0319n.06

No. 24-5328

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jul 02, 2025
KELLY L. STEPHENS, Clerk

|                                    |     |                                    |
| ---------------------------------- | --- | ---------------------------------- |
| UNITED STATES OF AMERICA,          | )   |                                    |
|                                    | )   |                                    |
| Plaintiff - Appellee,              | )   | ON APPEAL FROM THE                 |
|                                    | )   | UNITED STATES DISTRICT             |
| v.                                 | )   | COURT FOR THE EASTERN              |
|                                    | )   | DISTRICT OF KENTUCKY               |
| CHASE RUSSELL DOWNEY,              | )   |                                    |
|                                    | )   | OPINION                            |
| Defendant - Appellant.             | )   |                                    |
|                                    | )   |                                    |
|                                    | )   |                                    |

Before: MOORE, BUSH, and NALBANDIAN, Circuit Judges.

BUSH, J., delivered the opinion of the court in which NALBANDIAN, J., concurred. MOORE, J. (pg. 15), delivered a separate dissenting opinion.

**JOHN K. BUSH, Circuit Judge.**  Chase Downey appeals his conviction and sentence for charges related to his involvement in a drug trafficking operation.  He challenges the sufficiency of the evidence, the district court's application of sentence enhancements, and two evidentiary issues.  We **AFFIRM**.

## I.      Facts of the Case

Chase Downey thought of himself as the type of drug trafficker "people make movies about."  Video Interview, R. 84 at 2:00.  But a life with a riveting plot had its downside.  Like silver screen characters from Tony Montana to Tony Soprano, Downey feared that "someone was trying to get me."  R. 135, PageID 1010.  With this in mind, Downey reached out to the Drug Enforcement Administration (DEA) in August and September 2022, boasting that he could set up

a sting operation for them involving more than 100 kilograms of cocaine. But Downey failed to follow up, and he did not become an informant for the DEA.

The DEA, however, did follow up with Downey—it opened an investigation into him. Agents surveilled Downey at the Lexington, Kentucky home of his girlfriend, Lamari Henson. On December 12, 2022, they saw Downey arrive there with a man whom they later learned is named Sebastian. Downey's companion was there to pick up $150,000 of drug cash to drive to Texas. The DEA agents executed a search warrant the next day and recovered significant evidence that the house was part of a drug trafficking operation. Inside the home, agents found more than a pound of cocaine, more than a pound of Super Mannitol (a cocaine cutting agent), a drug press, and a "kilo packaging unit." R. 135, PageID 824. They also found $71,957 in cash and a currency-counting machine. And, in the master bedroom and bathroom, police recovered seven guns, including a semi-automatic shotgun with two curved magazines and a 12-gauge, pump-action shotgun with a pistol grip.

After the agents arrested Downey, he consented to an interview. He confessed in detail to his participation in a wide-ranging conspiracy to traffic cocaine. He said that the amount of cocaine in the house was small compared to the fifty or one-hundred kilograms he could acquire. He also said he got his drugs from Juan Arellano, who lived in Matamoros, a Mexican city bordering Brownsville, Texas. And he said he had worked with Arellano for a long time and had recently smuggled $1 million in drug proceeds to Mexico by walking across the border with cash in duffel bags. The agents corroborated Downey's account through border crossing reports that showed him crossing into the United States from Mexico fourteen times between September and November 2022. Downey also gave the agents four phones and unlocked them at their request.

The agents found text messages with Arellano in which he and Downey discussed drug payments exceeding $100,000 and how Downey could distribute between ten and twenty kilograms of cocaine at a time to buyers in Detroit and across Michigan.

A jury convicted Downey on five counts: (1) conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine, (2) possession with intent to distribute 500 grams or more of cocaine, (3) possession of a firearm by a felon, (4) possession of a firearm in furtherance of drug trafficking, and (5) conspiracy to commit money laundering. At sentencing, the district court largely adopted the recommendations from Downey's presentence report. It applied sentencing enhancements for his leadership of a criminal conspiracy and maintenance of drug premises. It also found that Downey qualified as an armed career criminal and as a career offender. It calculated his criminal offense level as 40 and criminal history category as VI (based on a score of 16 criminal history points), leading to a Guidelines range of 30 years to life imprisonment. In addition, Downey's conviction for possession of a firearm in furtherance of a drug trafficking crime mandated a consecutive five-year sentence, boosting his effective range to 35 years to life imprisonment. *See* 18 U.S.C. § 924(c). After weighing the 18 U.S.C. § 3553(a) factors, the district court sentenced Downey to 45 years' imprisonment.

## II.    Sufficiency of the Evidence

Downey argues that the government did not present enough evidence to convict him on any count except possession with intent to distribute 500 grams of cocaine. We must deny his sufficiency challenge if, "after viewing the evidence in the light most favorable to the prosecution," we conclude that "any rational trier of fact could have found the essential elements of the crime[s]

beyond a reasonable doubt." *United States v. Sadler*, 24 F.4th 515, 539 (6th Cir. 2022). We reach that conclusion for the reasons explained below.

### A. Conspiracy to Distribute Cocaine

The jury convicted Downey of conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846. The government had a burden to prove the existence of "(1) an agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy." *Id.* (quoting *United States v. Williams*, 998 F.3d 716, 728 (6th Cir. 2021)). As to quantity, the government needed to prove that five or more kilograms of cocaine were attributable to Downey or to the foreseeable conduct of his co-conspirators. *United States v. Rosales*, 990 F.3d 989, 997–98 (6th Cir. 2021).

Downey only challenges the quantity prong of the offense. He argues the government did not meet its burden because the police recovered less than a kilogram of cocaine at Henson's house. We disagree. The government presented sufficient evidence to find that Downey trafficked more cocaine than that found at Henson's house on the day of his arrest. Downey told agents that he had taken more than $1 million in cocaine proceeds across the Mexican border. Given that Downey also said he typically sold cocaine in Lexington for $20,000 per kilo, a jury could believe that he had trafficked greater than five kilograms of cocaine. The government also presented physical corroborating evidence from Henson's house that would allow a jury to infer the presence of a large drug operation, including a big drug press larger than what the DEA usually finds, more than a pound of a cocaine cutting agent, and equipment that could be used to package the cocaine into kilo units. In sum, the government presented sufficient evidence to show that Downey trafficked more than five kilograms of cocaine.

### B.     Firearm Charges

Downey next challenges the sufficiency of the evidence presented to convict him of possessing a firearm (1) as a felon and (2) in furtherance of drug trafficking. Downey's sole argument against both counts is that the government failed to show he actually or constructively possessed any of the seven firearms found at Henson's house. Constructive possession "exists when a person . . . knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Taylor*, 800 F.3d 701, 709 (6th Cir. 2015) (quoting *United States v. Gardner*, 488 F.3d 700, 713 (6th Cir. 2007)).

The record contains sufficient evidence that Downey constructively possessed the firearms in the residence. Although the home belonged to Henson, Downey had unfettered access to it: Henson gave him a door access code, he stayed there for weeks at a time, and he had permission to store items there. Henson testified that, other than her, Downey was the only person who stayed at the house and who had access to the firearms inside. She also testified that Downey brought into her home the shotgun that police found and that he had also brought into the house a handgun and a gun case in which police found three firearms. Further, the government showed the jury a picture from Downey's phone of him holding a gun inside the home. At the very least, this evidence is enough to sustain a finding that Downey constructively possessed the firearms found in Henson's home.

### C.     Conspiracy to Commit Money Laundering

Downey finally contests the evidence used to convict him of conspiracy to commit money laundering. The elements of conspiracy to commit money laundering are "(1) that two or more persons conspired to commit the crime of money laundering, and (2) that the defendant knowingly

and voluntarily joined the conspiracy." *United States v. Matthews*, 31 F.4th 436, 447 (6th Cir. 2022) (quoting *United States v. Powell*, 847 F.3d 760, 781 (6th Cir. 2017)). The corresponding crime of money laundering occurs when "the defendant knowingly used the proceeds from a specified unlawful activity in financial transactions that were intended to promote the continuation of the unlawful activity, or were designed to conceal or disguise the proceeds of the unlawful activity." *United States v. Castro-Aguirre*, 983 F.3d 927, 941 (7th Cir. 2020) (internal quotation marks and alterations omitted); *Matthews*, 31 F.4th at 447. Downey contends that (1) the government presented no physical evidence of money laundering, (2) Henson could not be a co-conspirator because she did not know the money was for illegal activity, and (3) there was no corroboration of Downey's statement that he transported $1 million of cocaine funds over the Mexican border. But the government did present such physical evidence. It also presented evidence of a conspiracy between Downey, Sebastian, and Arellano, making it unnecessary to show that Henson was a conspirator. Finally, the government corroborated Downey's statement about border smuggling with the proof of his border crossings.

The government's evidence on this count is strong. A "paradigmatic example" of money laundering is "a drug dealer using the proceeds of a drug transaction to purchase additional drugs and consummate future sales." *United States v. Tolliver*, 949 F.3d 244, 248 (6th Cir. 2020) (per curiam) (quoting *United Statas v. Warshak*, 631 F.3d 266, 317 (6th Cir. 2010)). There was good reason for the jury to believe drug smuggling is what Downey did. The agents found over $70,000 in the house when they arrested Downey. Downey also told agents he had given $150,000 to co-conspirator Sebastian to take to Houston, and Henson testified that she took $40,000 to Houston for Downey. Downey also confessed that he himself had smuggled upwards of $1 million across

6

the Mexican border, and, as noted, the government produced border crossing records showing that Downey had indeed crossed the border fourteen times between September and November 2022. *See United States v. Brown*, 617 F.3d 857, 862–63 (6th Cir. 2010) (discussing how evidence can corroborate a confession by supporting the facts confessed to). Finally, text messages between Downey and co-conspirator Arellano showed them discussing trafficking proceeds, sharing pictures of bulk cash, and trading information for Arellano's account with Cash App, a phone app used to exchange money. This evidence was more than enough for a rational juror to convict Downey for money laundering.

### III.     Evidentiary Objections

Downey renews two objections related to evidentiary issues, neither of which is meritorious.

### A.     Untimely Motion to Suppress

First, Downey contends that the district court abused its discretion by not allowing him to file an untimely motion to suppress. We review such a claim for an abuse of discretion. *United States v. Walden*, 625 F.3d 961, 964 (6th Cir. 2010).

The district court ordered Downey to file defensive motions by May 30. But he failed to meet this deadline. Downey received a new lawyer on June 13, but he concedes that this occurred after the trial court's deadline had passed.

On October 20, with the trial less than two weeks away, Downey asked for leave to file an untimely motion to suppress. Downey argued that he had good cause to not file earlier—he was negotiating a plea deal and felt that moving to suppress would have derailed the talks. The district court rejected this rationale and declined to allow Downey to file his untimely motion.

On appeal, Downey does not develop an argument that he had good cause to file his motion late. Downey's brief only cites the flexible standard for a district court to decide such issues case-by-case and states that the parties only completed discovery on August 21. Downey does not explain why ongoing discovery gave him good cause to file his untimely motion to suppress. Because Downey does not meaningfully develop his argument as to good cause, he forfeits it. *United States v. Jamison*, 85 F.4th 796, 800 (6th Cir. 2023).

Even if it were not forfeited, Downey's claim would not succeed. As Downey notes in his brief, "good cause" under Federal Rule of Criminal Procedure 12(b)(3)(C) is "a flexible standard heavily dependent on the facts of the particular case as found and weighed by the district court in its equitable discretion." *Walden*, 625 F.3d at 965. "Generally, if the failure to timely file occurred as a result of a lawyer's conscious decision not to file a pretrial motion before the deadline, the party seeking a waiver will not be able to establish good cause." *Id.* Downey's justification in the district court falls into this category—Downey consciously decided to not file his motion in an attempt to curry favor with the prosecution in plea negotiations. That is not a sufficient reason to establish good cause for failure to file in a timely manner.

The dissent argues that the district court abused its discretion because its filing deadline did not give Downey time to review discovery and because it denied Downey's requests to extend the deadline. But even if the district court had granted Downey's most recent request for an extension of the pretrial filing deadline, the new deadline would have been August 4. Downey moved to file his untimely motion on October 20, eleven weeks past the deadline he requested, and less than two weeks before trial. And more importantly, when Downey moved to file his untimely motion to suppress, he only cited the ongoing plea negotiations to explain his tardiness.

8

He did not say that he had too little time to review discovery. We cannot say the district court abused its discretion for failing to consider a ground that the defendant himself failed to raise. *United States v. Embry*, 728 F. App'x 544, 548 (6th Cir. 2018).

**B.**     **Hearsay**

Downey also argues that the district court violated the Federal Rules of Evidence by allowing the government to introduce inculpatory text messages found on a cell phone he gave the police. Downey claims these messages were not properly authenticated and were hearsay.

We review a challenge to a district court's decision to admit authenticated evidence for an abuse of discretion. *United States v. Damrah*, 412 F.3d 618, 628 (6th Cir. 2005). Downey argues that Detective Evans, who testified to the authenticity of the messages, did not know who owned or used the phone. The record contradicts this. Detective Evans testified that Downey possessed four phones. Downey allowed Detective Evans to search the phones, and Downey unlocked the phones for the officers. These facts are more than enough to establish Detective Evans's personal knowledge that the phones belonged to Downey. *See United States v. Franklin*, 415 F.3d 537, 549 (6th Cir. 2005) (noting the "low threshold of proof" required to allow testimony based on personal knowledge).

As to hearsay, Downey argues:

> These text message statements were clearly hearsay as no testimony was offered by anyone with personal knowledge of who was communicating in the texts admitted. Additionally, they were only offered for the truth of the matter asserted in the statements in an attempt to persuade the jury that Mr. Downey was engaged in large scale drug trafficking.

Appellant's Br. at 15. The first part of this argument appears to rehash the authenticity challenge. Construing Downey to argue that the texts are hearsay because neither Downey nor any of his

conversation partners testified, that argument fails. None of the texts Downey sent qualifies as hearsay. Fed. R. Evid. 801(d)(2)(A); *United States v. Chavez*, 951 F.3d 349, 361 (6th Cir. 2020). It is difficult to assess whether the statements of Downey's conversation partners would be excludable hearsay because Downey does not point to any specific statement or conversation. But the government notes that the texts include conversations with Arellano, the man who, according to Downey, sourced his drugs. To the extent that the government used such conversations to prove that Downey traffics drugs, such statements would fall into the co-conspirator exception to the hearsay rule. *See* Fed. R. Evid. 801(d)(2)(E); *United States v. Salgado*, 250 F.3d 438, 450 (6th Cir. 2001) ("Statements which identify another co-conspirator as the source of drugs involved in the conspiracy are in furtherance of the conspiracy."). We therefore find no error in the district court's admission of the inculpatory text messages.

## IV.     Sentencing Objections

The district court calculated Downey's offense level as 40 and his criminal history category as VI. It also categorized him as an armed career criminal and as a career offender. Downey challenges the district court's application to his offense level of a drug premises enhancement and a leadership enhancement. He also argues that the district court erroneously designated him as an armed career criminal and a career offender. None of Downey's challenges to his sentence has merit.

### A.     Drug Premises Enhancement

The Sentencing Guidelines mandate a two-level enhancement "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). When reviewing a district court's application of a sentence

enhancement, we review the district court's determination of the facts for clear error and its interpretation of the Guidelines de novo. *United States v. Taylor*, 85 F.4th 386, 388 (6th Cir. 2023).

There was substantial evidence that Downey maintained Henson's home as a drug premises. As noted, the DEA agents found in the home tens of thousands of dollars in cash, a drug press, a kilo packaging unit, cocaine, and a cocaine cutting agent. And DEA agents saw Downey meet with Sebastian at the home on the day before the DEA raid. Further, Henson's testimony reflects that Downey exercised "de facto control" over the home even though it belonged to Henson. *Id.* at 390. For instance, she testified that Downey had stayed at her home for weeks at a time, had a passcode to unlock the front door, and had her permission come and go as he pleased. She also said that Downey, with her permission, had stored drugs and guns at the home. Finally, Henson testified that, at Downey's direction, she had counted $150,000 in cash at the house and transported large sums of cash to Houston, suggesting Downey was in charge. The district court did not err by relying on this evidence to conclude that Downey maintained drug premises at Henson's home.

### B. Leadership Enhancement

The government also presented sufficient evidence to support the district court's application of a two-level leadership enhancement. The Guidelines mandate a two-level enhancement for a defendant who is an "organizer, leader, manager, or supervisor in any criminal activity" involving fewer than five participants. U.S.S.G. § 3B1.1(c). As relevant here, Downey would qualify for the enhancement if he "exercised control or authority over at least one accomplice." *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009).

Henson's testimony provides a sufficient basis for the district court to apply the leadership enhancement. She testified that Downey asked her to count cash and that she knew this cash came from Downey's trafficking activities. She also testified that Downey told her to drive to Houston with $40,000 of his drug money. Both examples demonstrate that Downey exercised control over Henson's activities as part of his drug trafficking enterprise. And Downey does not argue on appeal that the district court erred in crediting Henson's testimony.

### C.    Armed Career Criminal Status

Downey next challenges the district court's finding that he qualifies for a mandatory minimum term of imprisonment as an armed career criminal. A defendant qualifies as an armed career criminal upon conviction of being a felon in possession of a firearm while having three previous convictions for "a violent felony or a serious drug offense" committed on different occasions. 18 U.S.C. § 924(e)(1). A serious drug offense can be "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance . . . for which a maximum term of imprisonment of ten years or more is prescribed by law." *Id.* § 924(e)(2)(ii).

Downey challenges whether he has three qualifying convictions. He argues that three of his convictions (for offenses committed: in Kentucky and Ohio in 2011 and in Ohio in 2012) cannot undergird his armed career criminal designation. But, of these three convictions, the district court only relied upon the 2012 Ohio conviction. Downey argues that this conviction should "not be counted as a predicate offense[] as the underlying crimes do not meet the standard for violent crimes as they are lacking the requisite requirement of force." Appellant's Br. at 21. Even if this were true, it would not matter. Downey's 2012 Ohio conviction was on three counts: aggravated

12

robbery, felonious assault, and drug trafficking. For the drug trafficking count, Downey was sentenced to eleven years in prison. So the probation office and the district court were correct to count the 2012 Ohio conviction as a serious drug offense. It is irrelevant whether it would be wrong to count this conviction as a violent felony, as Downey argues. Because Downey's challenge to the counting of this conviction fails, and because he does not challenge the two other offenses that the district court actually used, Downey fails to show that the district court erred by designating him an armed career criminal.

### D.    Career Offender Status

"Errors that do not affect the ultimate Guidelines range or sentence imposed are harmless and do not require resentencing." *United States v. Faulkner*, 926 F.3d 266, 275 (6th Cir. 2019). We therefore need not address Downey's argument that the district court incorrectly designated him as a career offender because it would not have affected his Guidelines range. *See id.*

To begin, his offense level of 40 was higher than the applicable offense level Downey would have received as a career offender. *See* U.S.S.G. § 4B1.1(b). So his designation as a career offender had no impact on his offense level. Nor does Downey challenge the district court's calculation of his criminal history score as 16. Based on this score, Downey's criminal history category is VI, the highest category in the Guidelines. Because the district court had this independent basis to calculate Downey's criminal history category as VI, any alleged error in finding him a career offender would not have affected his criminal history category. Taken together, Downey's designation as a career offender made no difference to his Guidelines range. Consequently, any alleged error in that designation would be harmless.

**V.     Conclusion**

Because all of Downey's challenges to his conviction and sentence fail, we **AFFIRM** the judgment of the district court.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** I dissent from the majority opinion because the record demonstrates that the district court abused its discretion when it denied Downey's motions to extend his deadline to file pretrial motions. Accordingly, I would vacate the criminal judgment, reverse the district court's orders denying Downey's motions for extensions of time, and remand for the district court to resolve Downey's motion to suppress in the first instance.

There are several reasons to conclude that the district court abused its discretion when it denied Downey's motion to file an untimely motion to suppress. Given the district judge's 30-day deadline to file defensive motions, Downey effectively had no opportunity to review discovery before filing a pretrial motion to suppress. Replacement counsel appeared in June 2023 (after the deadline) and discovery was ongoing through at least August 2023. On several occasions, Downey sought an extension of time for pretrial filings, but the district court did not extend the deadline for filing defensive motions. With so much at stake in a criminal trial, district courts must provide adequate time for criminal defendants to make informed decisions. The district court's deadline in this case was wholly inadequate to achieve this important aim. In this context, the district court's decision was an abuse of discretion.

For these reasons, I respectfully dissent.